UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANAS ELHADY,

    Plaintiff,

v.

MATTHEW PEW, et al,

    Defendants,

_____/

Case No. 17-cv-12969

HON. MARK A. GOLDSMITH

# OPINION & ORDER
# DENYING DEFENDANTS' MOTION TO DISMISS (Dkt. 41)

This matter is before the Court on Defendants' motion to dismiss. The issues have been fully briefed. Because oral argument will not aid the decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons that follow, the Court denies the motion.

## I. BACKGROUND

The facts in this section are taken from Plaintiff Anas Elhady's Second Amended Complaint. Elhady brings a claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging violations of the Fifth and Eighth Amendments by Customs and Border Protection ("CBP") officers. Elhady is a United States citizen and Muslim living in Wayne County. 2d Am. Compl. ¶ 8 (Dkt. 27). Defendants are officers or agents of CBP. See id. ¶¶ 9-18.

Elhady alleges that he crossed through the Detroit-Windsor port of entry on April 10, 2015. 2d Am. Compl. ¶ 19. As he was crossing into Canada earlier that day, the Canadian inspection

1

officer had stopped Elhady, questioned him, and asked him to provide the time he expected to cross back into the United States. Id. ¶ 20. Elhady told the Canadian officer that he would be returning to the United States around midnight, which he ultimately did. Id. ¶¶ 21-24.

When Elhady approached the primary inspection booth to return to the United States, he handed Defendant Pew his documents; Pew immediately demanded that Elhady place his hands on the steering wheel, called for backup, and referred him to secondary inspection. Id. ¶¶ 25-26. Defendants then surrounded Elhady's car, ordered him out of the vehicle, and handcuffed him. Id. ¶¶ 27-28. Defendants took Elhady's jacket and shoes, then confined him in isolation in a small, freezing-cold holding cell with excessively bright lights for at least four hours. Id. ¶ 29. Elhady contends that he was subjected to extreme sensory deprivation, psychological torture, and isolation. Id. ¶ 31. After several hours, Elhady knocked on the door repeatedly and requested medical treatment. Id. ¶ 32. Defendants ignored his pleas for help. Id. ¶ 33.

Elhady's body began shaking uncontrollably, and he felt that he was going to die. Id. ¶¶ 34-35. After several hours, he suffered from hypothermia and fell unconscious. Id. ¶ 36. Defendants reentered the room while Elhady was unconscious; they woke him up and demanded he stand, which Elhady was unable to do. Id. ¶¶ 37-38. Elhady repeatedly begged for an ambulance, but his requests were ignored. Id. ¶ 39. He contends that he suffered from dehydration, shock, and hypothermia as a result of the conditions of his confinement. Id. ¶ 40.

At some later point, Elhady was taken to an ambulance. Id. ¶ 41. Defendants Kehr and Rocky handcuffed him in the ambulance at the instruction of Defendants Iverson and Lapsley; Kehr and Rocky accompanied him to the hospital. Id. ¶ 42. Upon admission to the hospital, a nurse asked Elhady why his lips were blue. Id. ¶ 45. After receiving treatment and medication,

Elhady was transported back to the Ambassador Bridge. Id. ¶ 47. At no point did Defendants find any contraband or evidence indicating illegal activity. Id. ¶ 48.

## II. STANDARD OF REVIEW

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . ."). Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote. Twombly, 550 U.S. at 556.

## III. ANALYSIS

Defendants raise several arguments. First, they argue that Elhady's claims are time-barred and that he is not entitled to equitable tolling. Next, they argue that Elhady has failed to state a

due process claim. Finally, they argue that Elhady has not sufficiently pled a Bivens claim, both because he did not allege any action by any defendant that deprived him of a constitutional right and because the Court should not create a Bivens cause of action for conditions of confinement under the Fifth Amendment. The Court addresses each argument in turn.

### A. Statute of Limitations and Equitable Tolling

Elhady does not contest that the statute of limitations expired before he filed his second amended complaint, which first listed the names of the individual Defendants. Thus, this claim is time-barred under Michigan's three-year statute of limitations unless Elhady is entitled to equitable tolling. See Harris v. United States, 422 F.3d 322, 331 (6th Cir. 2005) (noting that the local statute of limitations applies to Bivens claims); Mich. Comp. Laws § 600.5805(2) (setting a three-year period of limitations for death or injury actions to recover damages).

The Sixth Circuit has identified five factors to consider when determining whether equitable tolling is appropriate: "(1) lack of actual notice . . .; (2) lack of constructive knowledge . . .; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) plaintiff's reasonableness in remaining ignorant of the notice requirement." EEOC v. Kentucky State Police Dep't, 80 F.3d 1086, 1094 (6th Cir. 1996). The first, second, and fifth elements are not relevant here, as Elhady acknowledges that he was aware of the necessary requirements to proceed.

Elhady cites a case that has many similarities to his own, Olmstead v. Fentress Cty., TN, No. 16-46, 2017 WL 4176256 (M.D. Tenn. Sept. 21, 2017). In that case, the plaintiff asked the court to allow early discovery immediately upon filing the complaint and before the statute of limitations had expired. Olmstead's claim accrued on July 20, 2015, and he filed the complaint on June 23, 2016 – just one month before the one-year statute of limitations expired. Even though

4

the court did not address the request for early discovery until well after the limitations period expired, the court allowed equitable tolling because it was "not Olmstead's fault that the Court did not address his motion" and because he was working to learn the names of the John Doe defendants during the Court's delay. Id. at *6.

Similarly, Elhady filed his suit with some seven months to spare before the statute of limitations ran, and attempted to procure the names of the John Doe defendants even before filing a discovery motion with the Court. He served the United States Attorney on September 28, 2017, and the assigned Assistant United States Attorney did not refuse service until November 21, 2017, see 11/21/2017 Letter, Ex. A to Pl. Resp. (Dkt. 43-2). The next week, in a separate case in Virginia, Elhady's counsel issued document requests to obtain documents related to his border crossing; CBP produced the relevant documents on January 4, 2018 but redacted the names of the officers involved, see Pl. Resp. at 5 (Dkt. 43). Elhady's counsel followed up with an email requesting the identities of the agents on January 11, 2018, see 1/11/2018 Email, Ex. D to Pl. Resp. (Dkt. 43-5). The day before that email was sent, the Court had issued a show-cause order for failure to prosecute, and Elhady responded by filing the motion for limited discovery on January 18, which was then refiled on January 22 following a strike order. See 1/22/2018 Motion (Dkt. 16).

By January 22, 2018, Elhady had exhausted his ability to personally discover the names of the John Doe defendants, and it was not his fault that the Court did not resolve the motion before the statute of limitations expired in early April (more than two months after he filed the motion for discovery). Although there was some delay between the filing of the complaint and the filing of the motion for discovery, Elhady was acting diligently during that time to discover the names of the John Doe defendants. He also allowed the Court more time to rule on his motion than the plaintiff in Olmstead, who filed his complaint only one month before the statute of limitations

expired. Here, Elhady filed the motion more than two months before the limitations period expired.

The Court in Billups v. Scholl, No. 13-258, 2016 WL 3959062 (S.D. Ohio July 22, 2016), found similarly in denying a motion for summary judgment. There, the court determined that summary judgment was not appropriate because a jury could find that the statute of limitations should be tolled where only the police department "had access to the information regarding the names of the officers who conducted the stop and Billups repeatedly attempted to obtain information related to the stop." Id. at *7. Here too, Elhady attempted to obtain information related to the border-crossing incident by making discovery requests in the Virginia case and CBP refused to provide it.

This is not a case where the plaintiff waited until the last hours before filing a relevant motion, see Farzana K. v. Indiana Dept. of Educ., 473 F.3d 703, 705 (7th Cir. 2007) ("Waiting until the last hours is not diligent; the errors that often accompany hurried action do not enable the bungling lawyer to grant himself extra time."); where the moving party has a history of non-diligent action, see Searcy v. Cty. of Oakland, 735 F. Supp. 2d 759, 769 (E.D. Mich. 2010) ("The third factor—diligence—weighs decidedly against the plaintiff. He and his attorney have been late with respect to nearly every significant procedural event in this case."); or where the plaintiff failed to file suit before the limitations period expired, despite efforts to find the names of John Doe defendants within the limitations period, see Brown v. Cuyahoga Cty., Ohio, 517 F. App'x 431, 434 (6th Cir. 2013). For these reasons, the Court finds that Elhady is entitled to equitable tolling of the statute of limitations.

**B. Fifth Amendment Claim**

Elhady brings a Fifth Amendment claim, as that amendment's Due Process Clause prohibits the government from imposing torture or cruel and unusual confinement conditions on non-convicted detainees. See Bell v. Wolfish, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt"). This type of Fifth Amendment claim is analyzed "under the same rubric as Eighth Amendment claims brought by prisoners." Villegas v. Metropolitan Government of Nashville, 709 F. 3d 563, 568 (6th Cir. 2013). Not every injury suffered while detained constitutes an Eighth Amendment violation; rather, a plaintiff must show (i) the deprivation alleged is "sufficiently serious," such that it resulted in "the denial of 'the minimal civilized measure of life's necessities,'" and (ii) the official operated with "'deliberate indifference' to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). The latter occurs when a plaintiff shows that an "official knows of and disregards an excessive risk to inmate health or safety." Id. at 837.

Defendants concede that a cold cell can constitute an Eighth Amendment violation in some circumstances, see Def. Mot. at 17, but dispute that this case rises to that level. They cite a variety of cases that they consider to be worse, but which did not constitute cruel and unusual punishment. Elhady focuses primarily on two cases in which a violation was found. In Burley v. Miller, 241 F. Supp. 3d 828 (E.D. Mich. 2017), a prisoner survived summary judgment where he alleged that he was required to stand outside in freezing rain for ten to twelve minutes and then was denied dry clothing; the court determined that the plaintiff had a Bivens claim for the unconstitutional deprivation of the basic "human need" of "warmth." Id. at 839. In Hawk v. Two USM's Names Unknown, No. 17-00004, 2017 WL 3261460 (D. Mont. July 10, 2017), the court determined that a prisoner stated a Bivens claim based on allegations that he was not permitted to use the bathroom

for five hours despite repeated requests, eventually causing him to endure severe pain and lay in his own excrement for several hours.

The court's opinion in Burley provides a good template for consideration of cold-condition cases. In that case, the court observed that although the "Supreme Court has held that prison conditions may be uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment," the Eighth Amendment does impose "duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." Burley, 241 F. Supp. 3d at 836 (internal citations omitted) (alteration in original). Courts are to consider "[t]he circumstances, nature, and duration of a deprivation" in evaluating these claims. Id. (internal citations omitted) (alteration in original). "Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise— for example, a low cell temperature at night combined with a failure to issue blankets." Id. (internal quotation marks omitted) (emphasis in original). The court went on to analyze a number of cases, ultimately drawing the conclusion that there exists a "right to be free from exposure to severe weather and temperatures." Id. at 839. Notably, the court cited a Seventh Circuit case finding that frostbite, hypothermia, or a similar infliction is not an "absolute requirement to the inmate's challenge" in a cold-conditions case. See Del Raine v. Williford, 32 F.3d 1024, 1035 (7th Cir. 1994).

As noted previously, Elhady primarily relies on two cases. In Burley, the plaintiff alleged that he was ordered to stand in freezing rain for ten to twelve minutes and was then forced to stay

8

in his wet clothes for another two hours. The plaintiff also had a respiratory condition, which made him particularly susceptible to harm from exposure to cold conditions, and the defendants knew of this condition. Burley, 241 F. Supp. 3d at 838-839. The court observed that there was no penological justification for the defendants' conduct, and that the defendants' knowledge of Burley's condition showed deliberate indifference to his health. Id. at 838. In Hawk, the Court considered a Fifth Amendment pre-trial detention claim. See 2017 WL 3261460. The Court found that Hawk had sufficiently pleaded a Fifth Amendment claim, as "he was kept in a holding cell for nearly five hours without the ability to use the restroom, he repeatedly requested to use the restroom, and he was forced to endure severe pain and lay in his own excrement for several hours." Id. at *3.

Here, Elhady alleges that he told Canadian border patrol that he expected to return to the United States around midnight, and that Defendants knew as a result when he expected to cross back into the country. 2d Am. Compl. ¶¶ 22-24. He alleges that Defendants decreased the temperature in the holding cell to freezing temperatures prior to his arrival, and took his jacket and shoes from him before placing him into the cell. Id. ¶¶ 29-30. He asserts that he knocked on the door repeatedly and begged for medical attention, but that his pleas were ignored. Id. ¶¶ 32-33. He further alleges that he fell unconscious and suffered from dehydration, shock, and hypothermia as a result of the conditions in the holding cell. Id. ¶¶ 36-37, 40. He was then taken to a hospital by Defendants, where a nurse asked him why his lips were blue. Id. ¶¶ 41-45. He was provided medication before being taken back to the Ambassador Bridge. Id. ¶ 46.

Given the allegations in the complaint, the Court finds that Elhady has sufficiently alleged a Fifth Amendment claim. Elhady alleges that he was deprived of the basic human need for warmth to the extent that he suffered hypothermia, satisfying the first prong of the Farmer analysis.

9

The allegations also show deliberate indifference, as Elhady maintains that Defendants intentionally made the holding cell cold enough to cause harm, and also ignored his requests for medical attention.

Defendants claim that other cases with more serious circumstances have failed to meet the standard of deliberate indifference. However, those cases are all distinguishable. In <u>Wells v Jefferson Cnty. Sheriff Dep't</u>, 35 F. App'x 142 (6th Cir. 2002), the court addressed, in cursory fashion, a plaintiff's claim that his holding cell was cold and regularly sprayed with insecticides, finding that "his alleged exposure to these conditions for a period of six days does not rise to the level of a constitutional violation." <u>Id.</u> at 143. The court also noted that the plaintiff "did not intend to raise these allegations as a separate claim." <u>Id.</u> However, according to the district court opinion in that case, the plaintiff did not suffer any physical harm and did not complain to guards that his cell was uncomfortable. See <u>Wells v. Jefferson Cnty. Sheriff Dep't</u>, 159 F. Supp. 2d 1002, 1011 (S.D. Ohio 2001).

In <u>Bean v. Monroe</u>, No. 04-230, 2006 WL 625864 (W.D. Mich. Mar. 9, 2006), the court dismissed a case brought by a disruptive prisoner who was left in a cold cell without a suicide observation mat after he had assaulted staff who had previously tried to place the mat. In that case, however, the court's decision turned on the behavior of the plaintiff, with the court determining that the prison staff responded appropriately to that behavior; there is no allegation of bad behavior by Elhady here.

In <u>Washington v. Burks</u>, No. 04-10352, 2008 WL 8694601 (E.D. Mich. Dec. 17, 2008), the court found that the plaintiff's claim that she was deprived of a blanket on one of the coldest days of the year was not sufficient to survive summary judgment on an Eighth Amendment claim. See <u>id.</u> at *10. In that case, unlike here, there were no allegations of physical injury. See <u>id.</u>

10

("Absent evidence that plaintiff suffered a physical injury, deprivation of a mattress, blankets, or other bedding for a fixed period of time, such deprivation does not violate the Eighth Amendment.").

In Leonard v. Knab, No. 10-956, 2010 WL 6463878 (S.D. Ohio Dec. 17, 2010), the court found that plaintiff failed to "demonstrate that he was exposed to temperatures extreme enough to constitute cruel and unusual punishment," because "[b]eyond his conclusory allegations that the cold temperatures are detrimental to his health, Plaintiff fail[ed to] provide an estimate of the temperature, its duration, its affect on his health, or whether he [wa]s being denied warmer clothing or blankets to combat the alleged temperatures." Id. at *3. In Leonard, the plaintiff only alleged that he was being subjected to "the detrimental effects of cold temperatures" and that he was "in grave danger from the conditions." Id. at *1. Here, in contrast, Elhady has provided more than just conclusory allegations; he has specifically alleged that he suffered from dehydration, shock, and hypothermia, and that a nurse observed that his lips were blue when he was admitted to a hospital.

Finally, in Palmer v. Abdalla, No. 11-503, 2012 WL 4473203 (S.D. Ohio Sept. 26, 2012), the court found that two days in a cell with no heat in February, leading to numbness in his hands and feet, was not sufficient to satisfy an Eighth Amendment claim. Id. at *2. This case differs for two reasons. First, Palmer sued the sheriff only in his official capacity, and there was no indication of an official policy. Second, Elhady alleges more than just cold conditions; he alleges that he was placed in a cell that was intentionally made cold.

Because Elhady has satisfied both elements of an Eighth Amendment claim under Farmer, the Court finds that he has sufficiently pleaded a Fifth Amendment claim.

### C. Bivens Claim

Defendants also argue that the Bivens aspect of Elhady's claim must fail for two reasons. First, Defendants argue that Elhady has not sufficiently pleaded the claim as to individual Defendants, as the complaint does not allege any specific action by any defendant that deprived him of a constitutional right. Second, Defendants argue that the Court should not create a Bivens cause of action for conditions of confinement under the Fifth Amendment.

### 1. Specific Allegations

Defendants cite Shedden v. United States, 101 F. App'x 114 (6th Cir. 2004), to support their contention that a failure to allege with specificity what each individual officer did to violate the constitutional rights of a plaintiff dooms a Bivens claim. In that case, the plaintiff, a federal prisoner, brought Bivens claims against the Bureau of Prisons, the warden of his prison, the health services administrator at his prison, and three physician's assistants at the prison for inadequate medical care. The Court concluded that "Shedden failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for the alleged violation of his constitutional rights." See id. at 115. Elhady responds that the Defendants before this Court now are the individuals who placed him in a cell that they knew was intentionally made freezing in order to exact punishment on him.

When bringing a Bivens claim, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Here, Elhady has met that pleading standard. Defendants are correct that Elhady generally groups them together in recounting their supposedly unconstitutional conduct. See, e.g., 2d Am. Compl. ¶ 30 ("Upon information and belief, because Defendants knew that Mr. Elhady intended to return to the United States at or around midnight, they decreased the temperature in the holding cell to freezing temperatures prior to Mr. Elhady's arrival."); id. ¶ 33

("Defendants ignored his pleas for help and denied him medical treatment."). However, Elhady's complaint also specifically alleges that Defendants Bradley, Piraneo, Beckham, Lapsley, Iverson, Kehr, and Rocky (that is, all Defendants except Pew)[1] were "responsible for Plaintiff's secondary inspection and confinement conditions." See generally id. ¶¶ 11-18. Elhady learned of these Defendants' alleged roles through the discovery ordered by this Court, and this was the level of specificity provided by the Government. See Resp. to Interrogs., Ex. B to 2d Am. Compl., at 3-5 (Dkt. 27-2). These allegations are sufficient to show that those Defendants violated Elhady's constitutional rights, as they were collectively responsible for the cold conditions of the holding cell.

Further, even if these allegations would not be sufficient in a typical case, the particular circumstances of this case make the identity of the specific actors unknowable at this stage of the litigation. The allegations that give rise to the constitutional claim, specifically the decrease of the temperature in the holding cell and ignoring Elhady's calls for help, occurred outside of the presence of Elhady, and thus it would be impossible for him to know, without the benefit of discovery, the identities of the specific Defendants who took those actions. Cf. Greeg v. City of Highland Park, Michigan, 884 F.3d 310, 315-316 (6th Cir. 2018) ("Although damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right, . . . courts are disinclined to dismiss complaints that fail to allege specific conduct by each officer when the officers' actions have made them impossible to identify.") (internal quotation marks omitted) (emphasis in original).

---

[1] Elhady also alleged that Defendant Pew was the officer who referred him to secondary inspection. 2d Am. Compl. ¶ 10.

13

Accordingly, the Court finds that the complaint is specific enough as against each Defendant.

**2. Existence of Bivens Claim**

Defendants also argue that applying Bivens to these circumstances would constitute an extension of Bivens. If a Bivens claim arises in a new context, a court must consider whether there are any "special factors counselling hesitation" in the expansion of Bivens before doing so. Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017) (internal quotation marks omitted).

**a. New Context**

Defendants argue that a claim of cruel and unusual conditions of confinement incident to a border stop and search has never been recognized by the Supreme Court as giving rise to a Bivens cause of action, and thus that allowing this Fifth Amendment claim to move forward would be an extension of Bivens. Elhady responds that his claim falls within historical Bivens contexts, as line-level CBP agents have had Bivens claims brought against them in the past, and confinement in medically-dangerous conditions is not a new Bivens context.

As both parties acknowledge, "expanding the Bivens remedy is now considered a 'disfavored' judicial activity." Ziglar, 137 S. Ct. at 1857 (quoting Iqbal, 556 U.S. at 675). "The proper test for determining whether a case presents a new Bivens context" is to ask whether "the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court." Id. at 1859. The three contexts in which the Supreme Court has allowed a Bivens claim to proceed are Fourth Amendment searches, Fifth Amendment gender-discrimination claims, and Eighth Amendment failure to provide medical care claims. See id. at 1854-1855. A non-exhaustive list of meaningful differences includes

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer

> should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Id. at 1860.

This case represents a new Bivens context. The Supreme Court has been very particular in distinguishing between various contexts in the past. For example, a case against a private prison for failure to provide medical treatment was found to be a new context even though the Supreme Court had previously allowed a case with "almost parallel circumstances" to proceed against a federal prison. See Ziglar, 137 S. Ct. at 1859 (comparing Carlson v. Green, 446 U.S. 14 (1980), with Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001)). If the difference between those two cases is enough to constitute a new context, then an expansion to a different amendment – the Supreme Court has never acknowledged a Bivens claim for the Fifth Amendment right to be free from non-punitive claims of abuse – and a new agency also constitutes a new context. See Linlor v. Polson, 263 F. Supp. 3d 613, 620 (E.D. Va. 2017) (finding a new Bivens context, post-Ziglar, where the right at issue was a Fourth Amendment violation committed by a TSA officer, rather than a "typical" Fourth Amendment Bivens suit); Cuevas v. United States, No. 16-299, 2018 WL 1399910 (D. Colo. Mar. 19, 2018) (finding a new Bivens context, post-Ziglar, where the right at issue was a non-medical Eighth Amendment claim rather than an Eighth Amendment claim for deliberate indifference to medical needs). Thus, the Court finds that this case represents a new Bivens context.

### b. Propriety of Bivens Extension – Special Factors

Having determined that this case represents a new Bivens context, the Court must next analyze whether special factors counsel hesitation in expanding Bivens. The focus of this inquiry is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and

15

weigh the costs and benefits of allowing a damages action to proceed." Ziglar, 137 S. Ct. at 1858. Defendants present two factors that they claim counsel hesitation: (i) the availability of an alternate remedial structure, i.e., the Federal Torts Claims Act ("FTCA"); and (ii) the relationship between this case and national security.

As for the first argument, the Supreme Court has expressly held that the FTCA and Bivens exist as alternate paths, and that the existence of the FTCA does not have any bearing on the option of bringing a Bivens claim. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 68 (2001) ("We also found it crystal clear that Congress intended the FTCA and Bivens to serve as parallel and complementary sources of liability.") (internal quotation marks omitted); Linlor, 263 F. Supp. 3d at 621 (quoting Malesko, post-Ziglar, to find that the existence of the FTCA does not counsel against expanding Bivens). "An FTCA claim is simply not 'a substitute for a Bivens action.'" Linlor, 263 F. Supp. 3d at 621 (quoting Bush v. Lucas, 462 U.S. 367, 378 (1983). Thus, the existence of the FTCA does not counsel hesitation.

As for the second argument, there are only a handful of cases post-Ziglar that touch upon national security issues. One is Hernandez v. Mesa, 885 F.3d 811 (5th Cir. 2018), in which the Fifth Circuit, on remand from the Supreme Court, determined that the family of a fifteen-year-old Mexican citizen could not bring a claim against the CBP agent who shot and killed him; the shot was fired from the United States and killed the boy in Mexico. The court found that there were numerous "special factors" at issue. First, the court observed that "[t]he Supreme Court has never implied a Bivens remedy in a case involving the military, national security, or intelligence." Id. at 818-819 (quoting Doe v. Rumsfeld, 683 F.3d 390, 394 (D.C. Cir. 2012)). National security is the prerogative of the executive and legislative branches, and "[n]ational-security concerns are hardly 'talismanic' where, as here, border security is at issue." Id. at 819 (internal quotation marks

16

omitted).  The court determined that "the threat of Bivens liability could undermine the Border Patrol's ability to perform duties essential to national security," and thus found that the claim could not proceed.  Id.

A district court in the Western District of Washington found similarly in Boule v. Egbert, No. 17-106, 2018 WL 3993371 (W.D. Wash. Aug. 21, 2018).  In that case, a CBP agent entered onto the plaintiff's property – an inn – hoping to speak to a guest about his immigration status.  The plaintiff asked the agent to leave, after which the agent remained on the property and confirmed that the guest was legally in the country.  The plaintiff brought a Bivens action for violation of the Fourth Amendment.  The court concluded that the agent violated the Fourth Amendment, but nonetheless dismissed the claim, finding "that Plaintiff's claims raise significant separation-of-powers concerns by implicating the other branches' national-security policies."  Id. at *5.  According to the court, "the risk of personal liability would cause Border Patrol agents to hesitate and second guess their daily decisions about whether and how to investigate suspicious activities near the border, paralyzing their important border-security mission."  Id.

The Third Circuit held similarly in a case involving TSA agents.  See Vanderklok v. United States, 868 F.3d 189 (3d Cir. 2017).  In that case, the plaintiff was referred to secondary inspection at the Philadelphia airport.  According to the plaintiff, he requested a complaint form and "stated his intention to report [Agent] Keiser's behavior."  Id. at 194.  He was allowed to leave the screening area.  According to the defendant, the plaintiff made a bomb threat and so he called the Philadelphia Police Department after the plaintiff left the screening area.  Video evidence contradicted the agent's point of view, and the plaintiff was acquitted following a motion for judgment of acquittal in the Pennsylvania state courts.  The plaintiff brought a host of claims, including a First Amendment retaliatory prosecution claim and Fourth Amendment malicious

prosecution claim against the agent. The Third Circuit dismissed the claims, finding that special factors counseled hesitation in extending Bivens to that context. Id. at 205-206. The court noted that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," id. at 206 (quoting Haig v. Agee, 453 U.S. 280, 292 (1981)) (alteration in original), and that the "reluctance of the Supreme Court to weigh in on issues of national security strongly suggests that we too should hesitate to create a remedy when those issues are in play," id. at 207. The court concluded that the "threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers," and dismissed the case. Id.

However, the Ninth Circuit ruled differently in Rodriguez v. Swartz, 899 F.3d 719 (9th Cir. 2018), another cross-border shooting case. In Rodriguez, the family of a Mexican minor brought suit against the CBP agent who shot and killed their child. The court found that no special factors counseled hesitation. Notably, the court considered and rejected a national-security challenge to the suit, finding that "holding [the defendant] liable for this constitutional violation would not meaningfully deter Border Patrol agents from performing their duties." Id. at 746. The court explained that the "United States and [the defendant] have identified no duty that would have required [the defendant] to shoot [the victim]." Id.

A judge in the Eastern District of Virginia found similarly to the court in Rodriguez. See Linlor, 263 F. Supp. 3d at 624. In that case, the plaintiff alleged that a TSA officer punched him in the groin while conducting a screening. The court rebuffed any national-security concern, finding that cases in which courts refused to extend Bivens "have involved lawsuits against officials alleged to have acted in accordance with national security policy." Id. (emphasis in original). The court noted that, although "[c]ourts must approach novel Bivens claims with

18

skepticism," that does not mean that "vague generalizations about the importance of national security are sufficient to defeat Bivens liability." Id. at 625.

This present case is more aligned with Rodriguez and Linlor, and thus the Court concludes that a national-security concern does not counsel hesitation in extending Bivens here. Notably, unlike in the three cases that declined to extend Bivens, Elhady does not challenge the action that does touch upon national security, i.e., his detention. That is to say, he does not argue that he was impermissibly detained. Rather, Elhady challenges only the conditions of his detention, and Defendants have offered no plausible explanation why intentionally placing a detainee in a freezing-cold holding cell protects national security. Accordingly, even though this is a new Bivens context, Defendants have provided no reasons that counsel hesitation, and thus the claim should be allowed to proceed.

To find to the contrary would be to allow "national-security concerns" to "become a talisman used to ward off inconvenient claims," which the Supreme Court specifically warned against in Ziglar. See 137 S. Ct. at 1862. Defendants try to do exactly that here; Defendants do not even attempt to describe how this case implicates national security, but rather claim "national security" in the hope that the Court will look no further. But there is no plausible national-security interest in placing a person in a room so cold that he develops hypothermia within a matter of hours, and Defendants' refusal to offer any kind of explanation speaks volumes. See Meshal v. Higgenbotham, 804 F.3d 417, 445 (D.C. Cir. 2015) (Pillard, J., dissenting) ("If Article III judges must sometimes cede our rights-protective role in deference to the political branches on matters of national security, we should do so only with a responsible official's authoritative and specific assurance of the imperative of doing so. . . . Before declining to recognize a cause of action because of national security concerns, the court should require the government to provide a concrete,

plausible, and authoritative explanation as to why the suit implicates national security concerns."). By claiming national security and refusing to offer any kind of justification for that claim, Defendants essentially seek immunity for <u>any</u> CBP action taken against a United States citizen at the border. <u>Ziglar</u> disavows such an attempt, and the Court will not allow that argument to win the day in this case.[2]

## IV. CONCLUSION

For these reasons, Defendants' motion to dismiss (Dkt. 41) is denied. Defendants shall answer the amended complaint within fourteen days. A notice for an in-person on-the-record scheduling conference shall be issued.

SO ORDERED.

Dated: March 1, 2019
       Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 1, 2019.

s/Kristen MacKay for Karri Sandusky
Case Manager

---

[2] Defendants similarly make a bare-bones claim arguing that the Court should not extend <u>Bivens</u> to this claim because immigration issues may implicate "foreign policy." <u>See</u> Def. Mot. at 25. But "just as national security cannot be used as a talisman to ward off inconvenient claims, neither does the mere incantation of the magic words 'foreign policy' cause a <u>Bivens</u> remedy to disappear." <u>Rodriguez</u>, 899 F.3d at 746 (internal quotation marks omitted). Defendants do not even attempt to explain how placing a United States citizen in a freezing-cold cell at the border would implicate foreign policy; thus there is no need to address it. <u>See</u> <u>McPherson v. Kelsey</u>, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (alteration in original) (internal quotation marks omitted).