

# Transcript of Scott Rocky

**Date:** September 27, 2019
**Case:** Elhady -v- Pew, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Scott Rocky
Conducted on September 27, 2019

---

**1**

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
 2           FOR THE EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   ANAS ELHADY,
 6              Plaintiff,
 7       vs.              Case No. 17-12969
 8                   Hon. Mark A. Goldsmith
 9                   Mag. Judge Anthony P. Patti
10
11   MATTHEW PEW, et al.,
12   In their individual capacities, only,
13              Defendants.
14   ---------------------------
15
16
17   The Deposition of SCOTT ROCKY,
18   Taken at 211 West Fort Street, Suite 2001,
19   Detroit, Michigan,
20   Commencing at 10:14 a.m.,
21   Friday, September 27, 2019,
22   Before Joanne Smith, CSR-3099.
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3   CAROLYN HOMER
 4   Council on American-Islamic Relations
 5   453 New Jersey Avenue, Southeast
 6   Washington, DC  20003
 7   202.640.4943
 8   chomer@cair.com
 9       Appearing on behalf of the Plaintiff.
10
11   BENJAMIN A. ANCHILL
12   JAMES J. CARTY
13   United States Attorney's Office
14   211 West Fort Street, Suite 2001
15   Detroit, Michigan  48226
16   313.226.9566
17   benjamin.anchill@usdoj.gov
18   james.carty@usdoj.gov
19       Appearing on behalf of the Defendants.
20
21
22
23
24
25
```

**3**

```
 1   JONATHAN GOULDING
 2   United States Attorney's Office
 3   211 West Fort Street, Suite 2001
 4   Detroit Michigan 48226
 5   313.226.9742
 6   jonathan.goulding@usdoj.gov
 7       Appearing on behalf of U.S. Customs and Border
 8   Protection.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                   TABLE OF CONTENTS
 2
 3   WITNESS                          PAGE
 4   SCOTT ROCKY
 5
 6
 7   EXAMINATION BY MS. HOMER:          5
 8   EXAMINATION BY MR. ANCHILL:        95
 9   RE-EXAMINATION BY MS. HOMER:       107
10
11                   EXHIBITS
12
13   EXHIBIT                          PAGE
14   (Exhibits attached to transcript.)
15
16   DEPOSITION EXHIBIT 1               27
17   DEPOSITION EXHIBIT 2               47
18   DEPOSITION EXHIBIT 3               59
19   DEPOSITION EXHIBIT 4               73
20
21
22
23
24
25
```

5

1  Detroit, Michigan
2  Friday, September 27, 2019
3  10:14 a.m.
4          SCOTT ROCKY,
5  was thereupon called as a witness herein, and after
6  having first been duly sworn to testify to the truth,
7  the whole truth and nothing but the truth, was
8  examined and testified as follows:
9          EXAMINATION
10 BY MS. HOMER:
11 Q.  Good morning, Mr. Rocky.  My name is Carolyn Homer.
12     I'm an attorney at the Council of American and Islamic
13     Relations.  Could you please state and spell your
14     whole name for the record?
15 **A.  Sure.  It's Scott James Rocky, S-c-o-t-t, J-a-m-e-s,**
16 **R-o-c-k-y.**
17 Q.  And Mr. Rocky, have you ever been deposed before?
18 **A.  No.**
19 Q.  Have you ever testified in court before?
20 **A.  No.**
21 Q.  Have you ever been a party to any civil or criminal
22     lawsuit before?
23 **A.  We -- my daughter was bit by a dog when she was**
24 **younger and we had to sue, but that was it.**
25 Q.  But that didn't entail any depositions --

6

1  **A.  No.**
2  Q.  -- or court testifying?  I'm going to give you quick
3      instructions that your counsel probably went over with
4      you but I'm going to repeat them.  So first off, you
5      understand that you're under oath today?
6  **A.  Yes.**
7  Q.  You're sworn to tell the truth?
8  **A.  Yes.**
9  Q.  Is there any medical or other reason that you would be
10     unable to provide truthful testimony today?
11 **A.  No.**
12 Q.  I'm not trying to trick you but human language is hard
13     and so if I ask a question that's unclear, please just
14     ask me to clarify it.  Can you do that?
15 **A.  Yes.**
16 Q.  Okay.  And if I ask a question and you answer the
17     question, is it fair for me to assume that you have
18     understood the question?
19 **A.  Yes.**
20 Q.  You're doing an excellent job of this so far but
21     because we have a court reporter who's transcribing
22     this in a question and answer format, it's very
23     important to answer all my questions verbally.  Can
24     you try to answer questions verbally?
25 **A.  Yes.**

7

1  Q.  So that means that uh-huh or un-uh or nodding your
2      head, that doesn't show up on a transcript.
3  **A.  Right.**
4  Q.  So -- Excellent.  We will -- we will work on verbal
5      communication.  In addition, because we're trying to
6      get clean questions and answers, it's important that
7      we don't interrupt each other.  It's natural in human
8      conversation for you to assume that you know where I'm
9      going.  So sometimes I'll have to reask questions so
10     it shows up more clearly.  But can we try to not
11     interrupt each other?
12 **A.  Okay.**
13 Q.  Excellent.  Every now and then your counsel, Benjamin,
14     and counsel for Customs and Border Protection,
15     Jonathan, may object to a question I ask and so in
16     order to give them the space to do that, can you just
17     try to wait a half beat before you answer a question
18     in case they want to get something on the record?
19 **A.  Yes.**
20 Q.  Mr. Rocky, what is your understanding as to why you're
21     here today?
22 **A.  I believe that I'm being part of a, named as part of a**
23 **Bivens lawsuit that was brought by Elhady against us.**
24 Q.  Do you know what a Bivens lawsuit is?
25 **A.  I believe it is --**

8

1          MR. ANCHILL:  I object.  It calls for a
2      legal conclusion.
3  BY MS. HOMER:
4  Q.  You can still answer.
5          MR. ANCHILL:  Go.
6          THE WITNESS:  I believe it is suing us in
7      our individual capacities.
8  BY MS. HOMER:
9  Q.  Do you have any memory of Anas Elhady?
10 **A.  Yes.**
11 Q.  Okay.  We're going to get to that later but that's
12     good to know.  What did you do to prepare for your
13     testimony today?
14 **A.  I don't understand.**
15 Q.  Great.  Okay.  Before coming here today, did you
16     review any documents about this case?
17 **A.  I reviewed the record that was given to me.**
18 Q.  Okay.  And do you know what record that was?
19 **A.  I believe it was the TECS record that was printed out.**
20 Q.  Okay.  Aside from the TECS record did you review
21     anything else?
22 **A.  No.**
23 Q.  Mr. Rocky, what is your educational background?
24 **A.  I have a high school diploma.  I have basic U.S.**
25 **Customs and Border Protection training.  I attended**

9

1  the American University, American Military University
2  towards a degree in homeland security.  I have classes
3  that I've taken as part of being a Customs and Border
4  Protection officer.
5  Q.  Okay.  So you said you attended this American
6  University Homeland Security Program?
7  A.  It's the American Military University.
8  Q.  American Military University?
9  A.  AMU.
10 Q.  But you did not complete a degree there, at least not
11  yet?
12 A.  No.
13 Q.  Okay.  Are you still working on a degree there?
14 A.  No.
15 Q.  Okay.  What certifications do you have?  You mentioned
16  that you had gotten some CBP training; right?
17 A.  Yes.
18 Q.  Okay.  Did any of those trainings lead to like a
19  formal certification of any sort?
20 A.  Well, I have basic first aid, American Red Cross, CPR.
21 Q.  Okay.  You are not a certified emergency medical
22  technician?
23 A.  No.
24 Q.  What courses have you attended as part of your CBP
25  training?

10

1  A.  Well, most recently I attended an x-ray training
2   class.  We have yearly recertifications we have to do
3   and I also was a CTR officer.
4  Q.  What's a CTR officer?
5  A.  Counter-terrorism response officer.
6  Q.  Okay.  Is CBP your current employer?
7  A.  Yes.
8  Q.  How long have you been employed by CBP?
9  A.  Since May of 2008.
10 Q.  And CBP has been your employer for the last 11 years?
11 A.  Yes.
12 Q.  When you were hired in 2008 by CBP, what was your job
13  title?
14 A.  U.S. Customs and Border Protection officer.
15 Q.  And have you been promoted or has your title changed
16  since then?
17 A.  No.
18 Q.  Have you ever held a supervisory position?
19 A.  No.
20 Q.  At what point did you become a counter-terrorism
21  response officer?
22 A.  It may have been 2012 or 2013.  I don't remember the
23  exact date.
24 Q.  And are you still a counter-terrorism response
25  officer?

11

1  A.  No.
2  Q.  When did that change?
3  A.  Sorry.  They ended the counter-terrorism response
4   officer maybe four years ago, five years ago.
5  Q.  Were you a counter terrorism response officer in 2015?
6  A.  Yes.
7  Q.  When they, by they do you mean CBP, when they ended?
8  A.  Yes, I mean CBP.
9  Q.  Okay.  So when CBP ended the counter-terrorism
10  response officer designation, did they replace it with
11  a similar title or designation?
12 A.  Yes.
13 Q.  Okay.  What did they replace it with?
14 A.  The tactical terrorism response team.
15 Q.  Are you a member of a tactical terrorist response
16  team?
17 A.  No.
18 Q.  Why not?
19 A.  The job description as I knew it changed and I didn't
20  want to go through the additional training.
21 Q.  So what was the job description of a counter-terrorism
22  response officer?
23     MR. GOULDING:  Objection, scope, law
24  enforcement privilege and I'll direct the witness not
25  to answer.

12

1  BY MS. HOMER:
2  Q.  What is the job description of a tactical terrorism
3   response team member?
4     MR. GOULDING:  Objection, scope, law
5  enforcement privilege and I'll direct the witness not
6  to answer.
7  BY MS. HOMER:
8  Q.  Since 2008 in your time at CBP, where have you
9   physically worked?
10 A.  I started at the Fort Street Customs facility.  I was
11  there for three, maybe four months, and then I
12  transferred to the Ambassador Bridge passenger
13  facility and I've been there since.
14 Q.  So you have been stationed at the Ambassador Bridge
15  exclusively for approximately a decade?
16 A.  Yes.
17 Q.  Would you describe yourself as familiar with the
18  operations of the Ambassador Bridge?
19 A.  Yes.
20 Q.  Have you held any other special designations like
21  counter-terrorism response officer during your
22  decade --
23 A.  No.
24 Q.  -- at the Ambassador Bridge?
25 A.  Sorry.

Transcript of Scott Rocky
Conducted on September 27, 2019

---

13

1  Q.  You're fine.  What additional responsibilities does
2     being a counter-terrorism response officer include in
3     addition to being a Customs and Border Protection
4     officer?
5          MR. GOULDING:  You first.
6          MR. ANCHILL:  Objection, form.
7          MR. GOULDING:  Scope, law enforcement
8     privilege and I'll direct the witness not to answer.
9  BY MS. HOMER:
10 Q.  When you were a counter-terrorism response officer,
11    who did you report to?
12 A.  **That would have been the immediate supervisor on**
13    **shift.**
14 Q.  Okay.  And would that immediate supervisor have a
15    specific title?
16 A.  **Supervisory Customs and Border Protection officer.**
17 Q.  How did a counter-terrorism response officer
18    interact with the joint terrorism task force?
19         MR. GOULDING:  Objection, scope, law
20    enforcement privilege and I'll direct the witness not
21    to answer.
22 BY MS. HOMER:
23 Q.  Okay.  So in April of 2015, am I correct that you were
24    a Customs and Border Protection officer who was also
25    designated as a counter-terrorism response officer?

---

14

1  A.  Yes.
2  Q.  What were your job responsibilities within Customs and
3     Border Protection generally in April of 2015?
4  A.  **Generally as a U.S. Customs and Border Protection**
5     **officer, I was charged with interviewing people on**
6     **primary, determining their admissibility into the**
7     **United States.**
8  Q.  Did you have any role in performing secondary
9     inspections as well?
10 A.  **Yes.**
11 Q.  And did you frequently switch between primary and
12    secondary inspection duties?
13 A.  **Yes.**
14 Q.  Was there anything that could not be categorized as
15    primary or secondary inspections that you were doing
16    for CBP in April 2015?
17 A.  **Vehicle inspections, which would also be a form of**
18    **secondary.**
19 Q.  But you didn't have any sort of back office or
20    management or supervisor role in April 2015?
21 A.  **No.**
22 Q.  Did you have a set shift schedule in April 2015?
23 A.  **Yes.**
24 Q.  What was your shift?
25 A.  **2015, I'm not sure if I was 6:00 a.m. to 2:00 p.m. or**

---

15

1  6:00 a.m. to 4:00 p.m. at that time.
2  Q.  But your shift started at 6:00 a.m.?
3  A.  **Yes.**
4  Q.  You would never have worked between midnight and 6:00
5     a.m.?
6  A.  **I may have for overtime.**
7  Q.  How -- So it's my understanding that CBP kind of
8     allots a certain amount of overtime that officers can
9     work in a year.  Is that roughly fair?
10 A.  Yes.
11 Q.  Okay.  And then do you try to max out your overtime
12    every year?
13 A.  No.
14 Q.  No.  Okay.  But every now and then you do pick up
15    overtime?
16 A.  Yes.
17 Q.  So it's possible you could have worked a midnight
18    shift but that was not your standard shift?
19 A.  Yes.
20 Q.  Okay.  There's a central building at the Ambassador
21    Bridge port of entry where secondary inspections are
22    conducted; is that correct?
23 A.  Yes.
24 Q.  What do you call that building?
25 A.  Secondary.

---

16

1  Q.  Secondary.  Okay.  So if I refer to the secondary
2     building for the rest of this deposition, you'll know
3     what I'm talking about?
4  A.  **Yes.**
5  Q.  Can you describe the secondary building?
6  A.  **Two-story building, longer than it is wide.**
7  Q.  What physical condition is it in?
8  A.  **Varies, depending upon the state of repair it's in.**
9  Q.  How would you describe the state of repair?
10 A.  **Ongoing.**
11 Q.  Ongoing.  Is it an old building?
12 A.  **I don't know when it was constructed.**
13 Q.  Have you seen it undergo renovations in the decade
14    you've been working there?
15 A.  **I've seen it undergo repairs.**
16 Q.  What repairs have you seen it undergo?
17 A.  **Paint, new floor, new light fixtures put in in the**
18    **lobby area.**
19 Q.  Have you seen any like wholesale remodel where walls
20    are knocked down and rebuilt?
21 A.  **No.**
22 Q.  Have you seen any changes to the heating and cooling
23    system?
24 A.  **No.**
25 Q.  Do you have any role in identifying, identifying

---

17

1  maintenance problems in the building and requesting
2  their repair?
3  A.  No.
4  Q.  Do you know who is primarily responsible for
5  maintaining the physical condition of the building?
6  A.  I believe that's the bridge company.
7  Q.  Okay.  And is that its title, the bridge company, or
8  does it have a formal name?
9  A.  Ambassador Bridge Company.  I'm not sure if it's a
10  formal name.
11 Q.  Okay.  Is it your understanding that CBP leases that
12  secondary building from the bridge company?
13 A.  Yes.
14 Q.  Do you know anything about how maintenance records are
15  maintained in the secondary building?
16 A.  No.
17 Q.  Have you ever been in an office that keeps like
18  elevator records on file, something like that?
19 A.  Not that I'm aware of.
20 Q.  Okay.  You've never had cause to look through
21  maintenance records?
22 A.  No.
23 Q.  Are you aware of any complaints about the temperature
24  of the building?
25 A.  We will have passengers come in from when it's really

18

1  hot outside and say it's cold or when it's really cold
2  outside and say it's hot, but I think that is more of
3  a matter of perception.
4  Q.  Have you heard any complaints of it being particularly
5  hot during the summer?
6  A.  No.
7  Q.  Or any complaints about it being particularly cold in
8  the winter?
9  A.  No.
10 Q.  Do you have any knowledge as to the actual temperature
11  of the building at any given time?
12 A.  To the best of my knowledge, the thermostat is at 72.
13 Q.  So 72 degrees is the standard temperature it's
14  supposed to be set at?
15 A.  I believe.
16 Q.  Have you personally ever adjusted the thermostat in
17  the building?
18 A.  No.
19 Q.  Am I correct there's only one thermostat in the entire
20  building?
21 A.  No.
22 Q.  No.  Okay.  What thermostats are you aware of?
23 A.  There's a thermostat on the second floor and two
24  thermostats on the first floor.
25 Q.  And which floor is the main secondary inspection lobby

19

1  on?
2  A.  The first floor.
3  Q.  And which floor is like the secondary inspection
4  holding cells on?
5  A.  The first floor.
6  Q.  So on the first floor there are two thermostats you
7  said?
8  A.  Yes.
9  Q.  Can you describe where those thermostats are located?
10 A.  One is in the lobby area and one is just outside the
11  lobby area.
12 Q.  How does a person go about changing the temperature on
13  either of those thermostats on the first floor?
14 A.  They are kept locked.
15 Q.  Who has a key?
16 A.  Supervisor.
17 Q.  Is there only one supervisor with a key or do all
18  supervisors have a key?  Do you know?
19 A.  The supervisors have access to the key.
20 Q.  Okay.  Do you know where the key is stored?
21 A.  Yes.
22 Q.  Where?
23 A.  In the supervisor's office.
24 Q.  And what floor is the supervisor's office on?
25 A.  The first floor.

20

1  Q.  How far away is the supervisor's office from the
2  lobby?
3  A.  The door opens onto the lobby.
4  Q.  Have you ever seen a supervisor adjust any of the
5  thermostats in the secondary building?
6  A.  No.
7  Q.  Have you ever asked a supervisor to adjust any of the
8  thermostats in the secondary building?
9  A.  No.
10 Q.  Have you ever relayed a traveler's request to adjust
11  the temperature in the secondary building?
12 A.  No.
13 Q.  Do you know which thermostat would control the
14  temperature of the holding cells?
15 A.  I think it is the one on the second floor.
16 Q.  And why do you think that?
17 A.  That is what I've been told since I've worked there.
18 Q.  Have you ever looked at like the HVAC system
19  blueprints?
20 A.  No.
21 Q.  And you're not a mechanical engineer; right?
22 A.  No.
23 Q.  Have you personally ever complained that the building
24  was at an uncomfortable temperature?
25 A.  No.

21

1  Q.  Have you personally ever complained about any other
2      maintenance problems in the secondary building?
3  A.  No.
4  Q.  And are you aware of any changes to the thermostat
5      system in the decade that you've worked at the
6      Ambassador Bridge?
7  A.  No.
8  Q.  Have you ever heard a report that thermostat was
9      broken?
10 A.  No.
11 Q.  Have you ever measured the temperature in the building
12     with something other than a thermostat?  Okay.  Let me
13     clarify.  Like sometimes when I'm looking I have a
14     little laser that tells me the actual temperature.
15     Have you ever used something like that to determine if
16     like one part of the building is hotter or colder than
17     another?
18 A.  No.
19 Q.  Okay.  When a traveler is referred to secondary
20     inspection -- so let's see if my understanding is
21     right -- sometimes the secondary inspection just
22     happens while they're still in their car and they go
23     on their way; is that correct?
24 A.  I'm not sure -- I'm not sure what you're asking me
25     here.

22

1  Q.  Okay.  I'm trying -- I'm trying to understand kind of
2      the different things that could happen while somebody
3      is in secondary inspection.  Okay?  So my
4      understanding of the process is, if you're referred to
5      secondary, an individual in their car, go park in like
6      a secondary parking lot; is that fair?
7  A.  Yes.
8  Q.  Okay.  And that there are some people who never leave
9      that parking lot, they answer some more questions and
10     then are sent on their way; is that true?
11 A.  No.
12 Q.  Okay.  Are most people who are sent to secondary
13     inspection then sent to the public lobby on the first
14     floor of the secondary building?
15 A.  Yes.
16 Q.  And then are some individuals sent back to secondary
17     inspection put in one of the holding cells on the
18     first floor?
19 A.  Sometimes.
20 Q.  Do you have a rough sense of what percentage of
21     travelers sent to secondary are put in a holding cell
22     as opposed to waiting in the public lobby?
23 A.  I couldn't give you an exact percentage but it would
24     be very, very small.
25 Q.  So like less than one percent maybe?

23

1  A.  Could be.
2  Q.  Is there anywhere else that travelers referred to
3      secondary inspection are sent other than the public
4      lobby or the detention cells?
5  A.  No.
6  Q.  What is CBP's policy regarding when a traveler is put
7      in a holding cell as opposed to the public lobby?
8          MR. GOULDING:  That's a very broad
9      question.
10         MS. HOMER:  It is a broad question.
11         MR. GOULDING:  I'm going to object.  Scope,
12     law enforcement privilege and direct the witness not
13     to answer.
14         MS. HOMER:  Okay.
15 BY MS. HOMER:
16 Q.  When a traveler is placed in a holding cell, how long
17     are they permitted to be held there by CBP policy?
18 A.  After a certain amount of time we have to notify the
19     port director.  Past that, I believe we have to notify
20     the AUSA and let them make a determination.
21 Q.  And how much time goes by before you have to notify
22     the port director?
23 A.  I believe four hours.
24 Q.  And how much time before you have to notify the AUSA?
25 A.  I believe it's eight hours.

24

1  Q.  Have you personally ever notified an AUSA because
2      somebody had been held for more than eight hours?
3  A.  No.
4  Q.  Have you ever been on duty when an AUSA was notified
5      because somebody had been held for more than eight
6      hours?
7  A.  I couldn't tell you.
8  Q.  I guess -- or more -- more clearly, have you ever been
9      involved in the decision to call an AUSA even if you
10     did not personally make the phone call?
11 A.  No.
12 Q.  If CBP is, has made the determination to place a
13     traveler in a holding cell, do they usually handcuff
14     that traveler before putting him in the holding cell?
15 A.  Usually.
16 Q.  What items is a traveler who is being placed in a
17     holding cell allowed to have with them?
18 A.  None of their personal items that would be in their
19     pocket.  We would remove outer jackets.  We would
20     remove the belt and the shoes.
21 Q.  And would you also remove like a purse or laptop bag?
22 A.  Yes.
23 Q.  Cell phone in a pocket?
24 A.  Yes.
25 Q.  Any other luggage they might have with them?

25

1  A.  They would not have that.
2  Q.  They would not have luggage.  How about jewelry, like
3      necklaces?
4  A.  That would also be removed.
5  Q.  Hats?
6  A.  Yes.
7  Q.  You mentioned shoes.  Would you remove their socks if
8      they had them on?
9  A.  No.
10 Q.  And why are all of these items removed before placing
11     someone in a holding cell?
12 A.  To reduce the risk or chance of them injuring
13     theirself or someone else that may enter the cell.
14 Q.  So you don't want them having any item, for example,
15     they can use to hang themselves?
16 A.  Correct.
17 Q.  Have you ever seen an individual detained in a holding
18     cell who tries to harm themself?
19 A.  Yes.
20 Q.  Approximately how many times?
21 A.  Maybe twice.
22 Q.  And those occasions stand out to you?
23 A.  Yes.
24 Q.  Can you just give me a brief overview of what happened
25     on those two occasions?

26

1  A.  I went to check on a person in a cell and he was
2      slamming his head into the wall.
3  Q.  That's one of the times.  What happened the second
4      time?
5  A.  The second time was a woman and she kept trying to
6      slam herself up against the door.
7  Q.  And how did you respond in those circumstances where
8      there were individuals slamming themselves?
9  A.  Went and got supervision.  Notified supervision.
10 Q.  Were you involved afterwards in how your supervisors
11     handled that situation?
12 A.  Yes.
13 Q.  Was any medical attention called to the cells?
14 A.  Not that I can recall.
15 Q.  What was done to make the individuals stop slamming
16     themselves against the wall or door?
17 A.  They were secured to the bench.
18 Q.  With handcuffs?
19 A.  Yes.
20 Q.  Okay.  Would you describe yourself as generally
21     familiar with the holding cells at the Ambassador
22     Bridge?
23 A.  Yes.
24 Q.  How many of them are there?
25 A.  Two.

27

1  Q.  So I am going to mark Exhibit 1 to today's deposition
2      and off the record for a split second.
3          (Off the record at 10:45 a.m.)
4          (Back on the record at 10:45 a.m.)
5          MARKED FOR IDENTIFICATION:
6          DEPOSITION EXHIBIT 1
7          10:45 a.m.
8  BY MS. HOMER:
9  Q.  Okay.  Mr. Rocky, do you recognize these specific
10     photos?
11 A.  I believe this would be what I would refer to as cell
12     two.  This would be cell one.
13 Q.  And do you know what the third picture is of?
14 A.  It looks like a different angle of picture number one.
15 Q.  Okay.  Did you take the actual photos that are printed
16     here?
17 A.  No.
18 Q.  But you recognize them as being of the two holding
19     cells at the Ambassador Bridge secondary building?
20 A.  Yes.
21 Q.  Approximately how big is cell one?
22 A.  I couldn't tell you the exact size.  Probably 15 by
23     15.
24 Q.  Is it bigger or smaller than this conference room?
25 A.  Smaller.

28

1  Q.  And then approximately how big is cell two?
2  A.  Same size.
3  Q.  Do you have any role in maintaining the cleanliness or
4      physical condition of these cells?
5  A.  No.
6  Q.  Do you know who does?
7  A.  The — I believe General Services Administration takes
8      care of that.
9  Q.  And that's the GSA is the government facilities
10     body --
11 A.  Yes.
12 Q.  -- agency?
13 A.  (Indicating in the affirmative).
14 Q.  Okay.  What is inside these cells?
15 A.  Basically just what the pictures show.
16 Q.  Okay.  So I see a bench?
17 A.  Yes.
18 Q.  And is that bench bolted into the floor or wall?
19 A.  Yes.
20 Q.  Okay.  And what material is the bench made out of?
21 A.  Wood and metal.
22 Q.  And then I see what looks to be like concrete blocks.
23     That's what the walls are made out of?
24 A.  They're — yes.
25 Q.  Okay.  Then also concrete floors?

Transcript of Scott Rocky
Conducted on September 27, 2019

### 29

1  A.  Yes.
2  Q.  And then in one cell it looks like there's a concrete
3     privacy wall?
4  A.  Yes.
5  Q.  And then -- Okay.  That's in cell two.  And then in
6     cell one it looks like there's a metal privacy wall?
7  A.  Yes.
8  Q.  And then behind those walls there are toilets; right?
9  A.  Yes.
10 Q.  Is there a water fountain or hand washing station,
11    too?
12 A.  Yes.
13 Q.  Is that attached to the toilet?  Is it part of the
14    same unit?
15 A.  Yes.
16 Q.  Is that water drinkable?
17 A.  Yes.
18 Q.  Do you know if anyone ever like performs sanitary
19    inspections to ensure that it's drinkable?
20 A.  Not to my knowledge.
21 Q.  On the third one of these pictures there are lights.
22    Do you see that?
23 A.  Yes.
24 Q.  Is that basically the same lighting that is in both
25    cells?

### 30

1  A.  Could be.
2  Q.  How would you describe those lights?  I mean, are they
3     bright?  Are they dim?  Are they large?  Are they
4     small?  I mean, just --
5  A.  They're lights -- the one in the picture on page 3,
6     they look like these with a filter over them.
7  Q.  Okay.
8        MS. HOMER:  And just let the record reflect
9     that the witness pointed to the overhead lights in
10    this conference room.
11       MR. GOULDING:  They're 48-inch fluorescent
12    lights.
13       MS. HOMER:  I'm sure the General Services
14    Administration can give us more information.
15 BY MS. HOMER:
16 Q.  Okay.  Do those lights, do they have any sort of
17    dimmer switch on them?  Like can their brightness be
18    adjusted?
19 A.  No.
20 Q.  So are they either all on or all off?
21 A.  Yes.
22 Q.  Does it -- if they are off, is it very dark in that
23    cell?
24 A.  Yes.
25 Q.  Does the cell have any windows?

### 31

1  A.  There's a window in the door.
2  Q.  Okay.  And the window in the door, what does it look
3     out on, the hallway?
4  A.  The hallway.
5  Q.  Okay.  Are there any windows to the outside world?
6  A.  In the cells?
7  Q.  In the cells.
8  A.  No.
9  Q.  So across from the door, like the back wall of the
10    window or -- Start over.  So across from the door with
11    the window, like the other wall, is that an interior
12    wall to somewhere else in the building or is it back
13    up against an exterior wall of the building?
14 A.  Looking out from the cell?
15 Q.  No.  Okay.  So let's say you walk in the door.
16 A.  Okay.
17 Q.  The wall you're staring at when you walk in the door,
18    what does that wall back up against?
19 A.  I believe that's an exterior wall.
20 Q.  Also looking on page 3, there appears to be a vent in
21    kind of the middle of the picture?
22 A.  Yes.
23 Q.  What is that?
24 A.  A vent.
25 Q.  Is it -- is it an air vent?

### 32

1  A.  Yes.
2  Q.  Does it have both hot and cold air, depending on the
3     season?
4  A.  Yes.
5  Q.  Okay.  And then between the lights on the ceiling,
6     there's like a mesh thing.  I honestly don't know what
7     it is.  Do you know what that is?
8  A.  I apologize.  I thought that's what you were talking
9     about.
10 Q.  Oh, I apologize.  Okay.  Let's clarify.  So between
11    the lights there's this mesh box.  What is that?
12 A.  I believe that is the heating and cooling system.
13 Q.  Okay.  And then if you go down onto the side of the
14    wall there's another little mesh box.  Do you know
15    what that is?
16 A.  Personally, I believe that would be the cold air
17    return.
18 Q.  Okay.  So if I understand you right, the ceiling is
19    where air gets sent into the cell and the wall is
20    where air gets taken out of the cell?
21 A.  I believe.
22 Q.  You believe so.  Great.  Thank you.
23 A.  I'm not an HVAC guy so that's pure speculation on my
24    part.
25 Q.  I understand.  I promise I'm asking this question to

Transcript of Scott Rocky
Conducted on September 27, 2019

9 (33 to 36)

**33**

1    more people than yourself. Just trying to see what
2    you understand. Okay. But to your knowledge, both
3    hot and cold air is sent into the cell through the
4    ceiling vent, depending on the season?
5 **A. Yes.**
6 Q.   Are there any cameras in the holding cells?
7 **A. No.**
8 Q.   Do you know why not?
9 **A. For the individual's privacy.**
10 Q.   Are there any cameras in the hallways right outside
11    the holding cells?
12 **A. No.**
13 Q.   Do you know why not?
14 **A. No.**
15 Q.   Are -- okay. So you said there is a window in the
16    door to each of the cells; correct?
17 **A. Yes.**
18 Q.   And a CBP officer could look in through that window to
19    see what's going on in the cell?
20 **A. Yes.**
21 Q.   Can a CBP officer see the entire cell when he or she
22    looks in through that window?
23 **A. Yes.**
24 Q.   How can they see the entire cell?
25 **A. If you look on the picture number one in the top right**

**34**

1    **corner there's a mirror.**
2 Q.   So where -- Would you agree with me that these photos
3    are only partial photos of the cell; they don't
4    capture everything?
5 **A. Yes.**
6 Q.   Okay. So when you're looking at this first photo,
7    which you said was cell two, is the door in
8    relationship to the mirror?
9 **A. The opening on the picture in the bottom right-hand**
10    **corner, the door would be opposite that.**
11 Q.   So --
12 **A. No. It would be right here.**
13 Q.   Oh, okay.
14 **A. I don't know how else to describe it.**
15 Q.   Okay.
16       MS. HOMER: So let the record reflect that
17    the witness is pointing to the bottom third.
18       THE WITNESS: It would be to the right of
19    the bench behind the bench or in front of the bench as
20    it's facing you.
21 BY MS. HOMER:
22 Q.   Okay. So when you look in, you would see the bench to
23    your left?
24 **A. Correct.**
25 Q.   And then you would see the mirror to your top right?

**35**

1 **A. Correct.**
2 Q.   And then the mirror would be reflecting behind this
3    privacy area?
4 **A. Yes. And in the corner.**
5 Q.   And on the next page, which is of cell one; right?
6 **A. Yes.**
7 Q.   Where is the mirror here?
8 **A. Top left.**
9 Q.   Okay. And where is the door?
10 **A. It would be in line with the bench.**
11 Q.   Okay. So, similarly, when you open the door, you
12    would see the bench, then you could look up to the
13    mirror to see behind the privacy screen?
14 **A. Yes.**
15 Q.   Are there any microphones to pick up audio in a cell?
16 **A. No.**
17 Q.   Are there any speakers or intercoms to convey audio
18    messages into the cell?
19 **A. No.**
20 Q.   Is there any sort of like buzzer system so that
21    somebody within the cell could hit a button to get
22    someone's attention?
23 **A. No.**
24 Q.   How do individuals who are in a cell get the attention
25    of CBP officers?

**36**

1 **A. Generally by knocking on the door.**
2 Q.   And knocking on the door can be heard from out in the
3    hall?
4 **A. Yes.**
5 Q.   How far away can the knock be heard?
6 **A. Depends upon how hard they knock.**
7 Q.   Okay. So I guess an ordinary knock?
8 **A. Probably down towards the interview rooms you can hear**
9    **somebody knocking on the door.**
10 Q.   How far away are the interview rooms?
11 **A. Ten, 15 feet, if, if that much.**
12 Q.   Are there CBP officers stationed in the hallway
13    outside of the holding cells whenever somebody is in a
14    holding cell?
15 **A. No.**
16 Q.   How -- Are CBP officers like making rounds and
17    checking in on the holding cells regularly?
18 **A. Yes.**
19 Q.   How often are CBP officers supposed to be checking in?
20 **A. Every 15 minutes.**
21 Q.   So if I'm understanding this right, even if somebody
22    knocks on the door from inside the cell and doesn't
23    get a CBP officer's attention, somebody should still
24    be coming by within the next 15 minutes?
25 **A. Yes.**

Transcript of Scott Rocky
Conducted on September 27, 2019

---

37

1  Q. Do CBP officers ever intentionally ignore an
2      individual knocking on the door?
3  A. No.
4  Q. If an individual in a cell is being really annoying
5      and knocking constantly, would a CBP officer ignore
6      that?
7  A. No.
8  Q. How would you describe the doors to these cells?
9  A. They're metal doors with a window.
10 Q. Can you hear sound through them?
11 A. Yes.
12 Q. Can you hear an ordinary conversation through them?
13 A. I would have to talk maybe a little louder than normal
14     but other than that.
15 Q. If someone was screaming at the top of their lungs,
16     how far away down the hall would you be able to hear
17     that?
18 A. You'd be able to hear that in the lobby, at the very
19     least.
20 Q. If officers were having just a conversation in this
21     tone of voice right outside the door, would you be
22     able to hear the words of the conversation?
23 A. I don't know.
24 Q. Have you ever been locked in one of the cells?
25 A. No.

---

38

1  Q. Have you ever been locked in one of the cells with an
2      individual in the cell?
3  A. No.
4  Q. Have you ever questioned an individual in a holding
5      cell?
6  A. Yes.
7  Q. How common is that, to question an individual in the
8      holding cell?
9  A. Not that common.
10 Q. Why?
11 A. Mostly it's because if we're doing an interview with
12     somebody in a cell, we would take them to a secure
13     interview area.
14 Q. And where is the secured interview area?
15 A. Ten to 15 feet down the hallway.
16 Q. And what makes the secured interview area different
17     from a holding cell?
18 A. More comfortable for everybody involved. A softer
19     chair that they can sit in to talk to.
20 Q. Are there cameras in the secure interview area?
21 A. Yes.
22 Q. On the occasions that you have questioned a traveler
23     in the holding cell as opposed to taking them to the
24     secure interview area for questioning, why did you do
25     that?

---

39

1  A. It would be to get an answer to a quick question.
2  Q. Have you ever conducted like a ten minute or more
3      questioning session in a holding cell?
4  A. No.
5  Q. What amenities are travelers provided with while in a
6      holding cell?
7  A. What do you mean by amenities?
8  Q. That is a good question. Are they provided with
9      water?
10 A. There's a drinking fountain.
11 Q. Okay. Do they ever request like bottled water
12     instead?
13 A. No.
14 Q. Are travelers provided with food while in a holding
15     cell?
16 A. Depends upon their length of stay in the cell.
17 Q. Is there a minimum length of stay after which CBP must
18     provide travelers with food?
19 A. Not that I'm aware of.
20 Q. You personally, when have you provided food to
21     travelers in the cells?
22 A. I personally have not.
23 Q. Okay. You have never brought food to somebody in a
24     holding cell?
25 A. No.

---

40

1  Q. Have you ever instructed someone else to bring food to
2      somebody in a holding cell?
3  A. No.
4  Q. Has a traveler ever asked you for food while they were
5      in the holding cell?
6  A. No.
7  Q. Okay. And we mentioned earlier there are bathroom
8      facilities in the cell including where travelers can
9      wash their hands; right?
10 A. Yes.
11 Q. Are there any pillows in the cell?
12 A. No.
13 Q. If a traveler asked for a pillow, would they get one?
14 A. Doubtful.
15 Q. Are there any blankets in the cell?
16 A. No.
17 Q. If a traveler asked for a blanket would they get one?
18 A. I doubt it.
19 Q. And why do you doubt it?
20 A. Because we don't want them to have anything they could
21     injure theirselves with.
22 Q. You mentioned earlier that jackets and outerwear are
23     usually taken away from a traveler before they're
24     placed in a holding cell?
25 A. Yes.

---

Transcript of Scott Rocky
Conducted on September 27, 2019

11 (41 to 44)

---

41

1  Q.  If they ask for their jacket back, would they get it?
2  A.  No.
3  Q.  Do travelers have access to any electronic devices of
4      theirs of any sort while they're in the cell?
5  A.  No.
6  Q.  Are travelers who are detained in a holding cell
7      provided any opportunity to contact their family?
8  A.  No.
9  Q.  Are travelers detained in a holding cell provided any
10     opportunity to contact a lawyer?
11 A.  No.
12        (Whereupon Vanessa Mays entered the
13     deposition room.)
14 BY MS. HOMER:
15 Q.  To your knowledge, is there a required temperature
16     that holding cells are required to be maintained at?
17 A.  I believe it's between 65 degrees and 75 but I'm not
18     sure.
19 Q.  Do you know who is responsible for ensuring that
20     holding cells are actually within that range?
21 A.  No.
22 Q.  Have you personally ever checked the temperature of a
23     holding cell while an individual was detained in it?
24 A.  No.
25 Q.  Is there any system for logging the actual temperature

---

42

1      of holding cells while individuals are detained in it?
2  A.  We have a system for logging the temperature of the
3      cell.
4  Q.  How does that system work?
5  A.  It's basically you check whether the temperature is
6      between 65 and I think 75.
7  Q.  And how does CBP -- how do CBP officers check the
8      actual temperature of the cell?
9  A.  The actual temperature of the cell would be based on
10     -- If it's cold in the cell, it's cold in the
11     interview rooms, so that would be basically how we
12     determine.
13 Q.  Okay.  So are CBP officers required to check the
14     temperature during their like 15 minute check-ins?
15 A.  No.  We check on the traveler to make sure he's okay.
16 Q.  Okay.  So under what circumstances would a CBP officer
17     be looking at the temperature of a cell?
18 A.  I couldn't tell you.
19 Q.  And you mentioned earlier that you thought the
20     upstairs thermostat controlled the temperature in the
21     downstairs cells; is that right?
22 A.  That's what I've been told.
23 Q.  Okay.  So is there any like routine or daily process
24     by which a CBP officer goes and checks the upstairs
25     thermostat to determine what the temperature in the

---

43

1      cells are?
2  A.  I don't know.
3  Q.  Have you ever personally written down the current
4      temperature of a holding cell while an individual was
5      in it?
6  A.  The current temperature, no.  I've --
7  Q.  Okay.  And you paused there so have you ever written
8      down a temperature related to a holding cell?
9  A.  I've selected a range.
10 Q.  What do you mean by that?
11 A.  The -- It -- It -- On the form, is the temperature
12     between 65 and 75.  Again I believe 75 is the top but
13     I'm not sure.
14 Q.  What form are you talking about?
15 A.  On the I-216.
16 Q.  Do you have any idea what that stands for?
17 A.  Immigration Form 216.
18 Q.  And the Immigration Form 216 has a place to record the
19     temperature of holding cell in it?
20 A.  Yes.
21        MS. HOMER:  Can we take a break for a
22     second?
23        MR. CARTY:  Sure.
24        (Off the record at 11:09 a.m.)
25        (Whereupon Vanessa Mays exited the

---

44

1      deposition room.)
2        (Back on the record at 11:18 a.m.)
3  BY MS. HOMER:
4  Q.  So before we took a break, we were talking about a
5      Form I-216; correct?
6  A.  Correct.
7  Q.  And is that the form Record of Persons and Property
8      Transferred?
9  A.  No.
10 Q.  No?  Okay.
11 A.  No.
12 Q.  Okay.  Is that form only used in conjunction with
13     aliens that are held by CBP?
14 A.  No.
15 Q.  Can you describe the form for me?
16 A.  It's an electronic form.
17 Q.  It's an electronic form?
18 A.  (Indicating in the affirmative).
19 Q.  And what other information does it ask for?
20 A.  Is water available, whether the person was admitted or
21     turned over to another agency or refused entry.
22        MS. HOMER:  I'd just like to know for the
23     record -- I don't think I've seen this form, so if I
24     could ask either defendants' counsel or CBP counsel to
25     produce it, I would appreciate that.  Okay.

---

Transcript of Scott Rocky
Conducted on September 27, 2019

---

45

1  BY MS. HOMER:
2  Q.  Are there any other forms used with respect to
3      individuals in holding cells that would record the
4      temperature of the cell?
5  A.  No.
6  Q.  On this I-216 form is the temperature only recorded
7      once or is it updated regularly?
8  A.  Once.
9  Q.  At what point is it recorded?
10 A.  When we initiate the form.
11 Q.  Okay.  And do you initiate the form when an individual
12     is first placed in the cell?
13 A.  Yes.
14 Q.  So you would not record the temperature when the
15     individual is ultimately released from the cell later?
16 A.  No.
17 Q.  Aside from the -- Actually, let me back up.  Is the
18     I-216 form always used with any individual placed in a
19     holding cell?
20 A.  Yes.
21 Q.  Was it in use in 2015?
22 A.  No.
23 Q.  When was it first introduced?
24 A.  I believe that was 2017.
25 Q.  Do you know why it was introduced?

---

46

1  A.  No.
2  Q.  Prior to 2017, in your time at the Ambassador Bridge,
3      are you aware of any form that required CBP officers
4      to record the temperatures in a holding cell?
5  A.  No.
6  Q.  Are you aware of any mechanism for logging the
7      temperature of a holding cell that CBP officers were
8      using at all?
9  A.  No.
10 Q.  Did you ever receive any complaints that a holding
11     cell was too hot?
12 A.  No.
13 Q.  Did you ever receive any complaints that a holding
14     cell was too cold?
15 A.  No.
16 Q.  Since 2017 has there ever been a time that you checked
17     the temperature of a holding cell and concluded that
18     it fell outside the guidelines set by CBP?
19 A.  No.
20 Q.  Have you ever refused to put an individual in a
21     holding cell because the cell was not at an
22     appropriate temperature?
23 A.  No.
24 Q.  Have you put an individual in a cell knowing it was
25     not and appropriate temperature?

---

47

1  A.  No.
2  Q.  Have you ever stepped into a cell when you were
3      detaining someone in it and kind of felt to yourself,
4      "Huh, it feels a little cold in here"?
5  A.  No.
6  Q.  Have you ever stepped into a cell where you're
7      detaining someone and thought, "Huh, it feels a little
8      hot in here"?
9  A.  No.
10 Q.  Have you ever heard any complaints that the conditions
11     a traveler was being held in in one of the Ambassador
12     Bridge holding cells were unsafe?
13 A.  No.
14         MS. HOMER:  Let me mark Exhibit 2.
15         MARKED FOR IDENTIFICATION:
16         DEPOSITION EXHIBIT 2
17         11:23 a.m.
18 BY MS. HOMER:
19 Q.  Mr. Rocky, are you familiar with this document?
20 A.  I just received it.  I haven't looked through it.
21 Q.  Yes.  Please take a moment to read through it.
22 A.  I'm generally familiar with this, yes.
23 Q.  How would you describe this document?
24 A.  Our standard operating procedure with dealing with
25     people that were detained.

---

48

1  Q.  And was this the standard operating procedure in 2015?
2      To the best of your knowledge?
3  A.  To the best of my knowledge.
4  Q.  Can you turn to the last two or three pages of where
5      it says Personal Detention Log Sheet?
6  A.  Yes.
7  Q.  Do you recognize that form?
8  A.  Yes.
9  Q.  Is this form different than the I-216 you were talking
10     about earlier?
11 A.  Yes.
12 Q.  Does the Personal Detention Log Sheet require an
13     officer to record the temperature of a detention cell?
14 A.  No.
15 Q.  Is this form still in use at the Ambassador Bridge
16     today?
17 A.  No.
18 Q.  Has this form been replaced by the I-216 you
19     mentioned?
20 A.  Yes.
21 Q.  Yes.  I mean, are there other forms?  Let me just ask
22     this better.  What form is used right now for
23     individuals in detention cells at the Ambassador
24     Bridge?
25 A.  It's an electronic form.

---

Transcript of Scott Rocky
Conducted on September 27, 2019

49

1 Q.  So how recently did the Ambassador Bridge start using
2    an electronic form for individuals in detention cells?
3 A.  **In the past couple of years.**
4 Q.  In 2015 was CBP using paper forms for individuals in
5    detention cells?
6 A.  **Yes.**
7 Q.  And this was the paper form they were using?
8 A.  **Yes.**
9 Q.  Where -- Okay.  You personally have escorted
10    individuals to a detention cell and secured them in
11    that cell; correct?
12 A.  **Yes.**
13 Q.  In the process of securing someone in a detention
14    cell, where and how does this form come into play?
15       MR. ANCHILL: Objection, form, compound.
16 BY MS. HOMER:
17 Q.  You can answer.
18 A.  **This form would be used when we place somebody in**
19    **detention immediately upon, after we completed a pat-**
20    **down on the individual and closed the door.**
21 Q.  What does a pat-down entail?
22 A.  **Checking to make sure they have no contraband items on**
23    **themselves.**
24 Q.  Okay.  And is the pat-down also where like the excess
25    clothing and jewelry is removed?

50

1 A.  **Yes.  We would remove down to their shirt.  Like we**
2    **would take off a jacket or a sweater that they had**
3    **over a shirt.**
4 Q.  Okay.  And is that part of the pat-down or is there a
5    different word used?
6 A.  **That's part of.**
7 Q.  Okay.  Where would a CBP officer pick up a physical
8    copy of this form when they're detaining an
9    individual?
10 A.  **They were kept on clipboards by the detention cells.**
11 Q.  Okay.  So on -- outside the door of the detention
12    cell?
13 A.  **Yes.**
14 Q.  Where there's just blank copies of this form?
15 A.  **Yes.**
16 Q.  And so when an individual was placed in it, would the
17    CBP officer then start filling it out?
18 A.  **Yes.**
19 Q.  Would the CBP officer update additional information on
20    this form every time a check-in happened?
21 A.  **Yes.**
22 Q.  And where would the time of each check-in be recorded?
23 A.  **It would be on the boxes on the right.**
24 Q.  Okay.  So the first check-in -- I should back up.  So
25    there are two sets of boxes with numbers?

51

1 A.  **Yes.**
2 Q.  Okay.  And then they each correspond like 1 to 1, 2 to
3    2, 3 to 3; right?
4 A.  **Yes.**
5 Q.  So the first check-in, the officer would fill in both
6    1 boxes?
7 A.  **Yes.**
8 Q.  And one of those boxes, would he fill it in with like
9    a description of what he saw?
10 A.  **Yes.**
11 Q.  And then the other 1 box on the right, he would fill
12    in the time and his initials?
13 A.  **Yes.**
14 Q.  Okay.  And then the next officer would come in and
15    fill in the 2 box with the same sort of information?
16 A.  **Correct.**
17 Q.  Once an individual was released from the holding cell,
18    what happens to the paper form?
19 A.  **The paper form should be attached to whatever**
20    **paperwork was generated for the reason he was in the**
21    **cell.**
22 Q.  Okay.  And with that bundle of paperwork, where does
23    it go?
24 A.  **That would get filed in our office.**
25 Q.  In the supervisor's office?

52

1 A.  **It is kept in one of the -- The filing system was kept**
2    **in one of the interview rooms.**
3 Q.  So there was a filing system in an interview room with
4    all of the detention paperwork packets for everyone
5    detained at the Ambassador Bridge?
6 A.  **Correct.**
7 Q.  Okay.  And to your knowledge were those paper files
8    ever scanned in and digitized?
9 A.  **After one month they were moved to another facility.**
10    **I don't know what happened after that.**
11 Q.  Do you know what facility they were moved to?
12 A.  **No.**
13 Q.  And do you know if before the paperwork was moved to a
14    different facility they would be scanned at the
15    Ambassador Bridge or otherwise digitized?
16 A.  **No, not to my knowledge.**
17 Q.  Have you ever seen a digital copy of a complete
18    detention paperwork file?
19 A.  **No.**
20 Q.  And then you stated that the paperwork files were only
21    held at the Ambassador Bridge for a month at a time?
22 A.  **Month, maybe two months at the tops.**
23 Q.  Okay.  So they don't have, for example, every record
24    of every detention going back five years on site at
25    the Ambassador Bridge?

Transcript of Scott Rocky
Conducted on September 27, 2019

14 (53 to 56)

53

1  A.  Correct.
2  Q.  Okay.  And you said that officers are supposed to
3      check in on the cells every 15 minutes; correct?
4  A.  Correct.
5  Q.  Have you -- And you have been the officer performing
6      those 15 minute check-ins?
7  A.  I have.
8  Q.  Okay.  Have you ever gone to do your 15 minute
9      check-in and looked at this form and realized it had
10     been, let's say, 30 minutes or more since the last
11     check-in?
12 A.  Not that I've ever noticed.
13 Q.  Have you ever been aware of complaints about officers
14     not performing the required check-ins?
15 A.  No.
16 Q.  Have you ever seen a form of a detention log sheet
17     where there's a long gap, like let's say an hour or
18     more between officers checking in?
19 A.  Not that I recall.
20 Q.  Are you aware of any discipline against any officer
21     for failing to conduct and log one of those 15 minute
22     check-ins?
23 A.  No.
24 Q.  You were familiar with what TECS records are; right?
25 A.  Yes.

54

1  Q.  Do you know whether the information contained on these
2      detention logs is ever incorporated into a TECS
3      record?
4  A.  No.
5  Q.  Have you ever seen that happen?
6  A.  No.
7  Q.  Have you personally ever lost a detention log sheet?
8  A.  No.
9  Q.  Have you ever been made aware that an individual's
10     detention log sheet has gone missing?
11 A.  No.
12 Q.  Would it concern you if a detention log sheet had gone
13     missing?
14 A.  Yes.
15 Q.  Why?
16 A.  Well, it's a record of a person in our custody.
17 Q.  And it's important to maintain accurate records?
18 A.  Yes.
19 Q.  Have you ever heard the Spanish phrase hialera,
20     spelled h-i-a-l-e-r-a?
21 A.  No.
22 Q.  Okay.  You've never heard it in any context?
23 A.  No.
24 Q.  Have you ever used it to describe CBP facilities?
25 A.  No.

55

1  Q.  Have you ever heard CBP border facilities described as
2      an icebox?
3  A.  No.
4  Q.  Have you ever heard CBP border facilities described as
5      a freezer?
6  A.  No.
7  Q.  Have you ever heard of any investigations into the
8      temperatures at which CBP maintains its facilities?
9  A.  No.
10 Q.  Have you ever heard of any investigations into the
11     temperature control systems at the Ambassador Bridge?
12 A.  No.
13 Q.  Do you have any social media accounts?
14 A.  Yes.
15 Q.  Do you have a Facebook account?
16 A.  Yes.
17 Q.  Do you have a Twitter account?
18 A.  No.
19 Q.  Do you have an Instagram account?
20 A.  Just because I have a Facebook account.
21 Q.  Okay.  Any other major social media?
22 A.  No.
23 Q.  Okay.  Are you aware of a Facebook group called I'm
24     10-15?
25 A.  Just what I've read in the news.

56

1  Q.  Have you ever been a member of the Facebook group
2      called I'm 10-15?
3  A.  No.
4  Q.  Have you ever been a member of any Facebook group
5      where a large number of CBP officers are also members
6      of that group?
7  A.  No.
8  Q.  Are you aware if any of your co-workers have been a
9      member of the Facebook group I'm 10-15?
10 A.  No.
11 Q.  Have you ever been party to any conversation among
12     your co-workers about CBP facilities having very cold
13     temperatures?
14 A.  No.
15 Q.  Is there a -- Back up.  Is there any sort of medical
16     professional on site at the Ambassador Bridge?
17 A.  We have EMTs that are regularly rotated through.
18 Q.  Okay.  And are those private EMTs or CBP EMTs?
19 A.  CBP EMTs.
20 Q.  And how long has it been the case that CBP has had
21     EMTs that rotate through the facility?
22 A.  Three, maybe four years.
23 Q.  Okay.  Did CBP have EMTs rotating through the
24     Ambassador Bridge in 2015?
25 A.  No.

Transcript of Scott Rocky
Conducted on September 27, 2019

15 (57 to 60)

57

1　Q.　Do you know why CBP now has EMTs on site?
2　**A.　I believe it's a recent program that CBP started but I**
3　**couldn't say for sure.**
4　Q.　You had no input in the decision to start that
5　program?
6　**A.　No.**
7　Q.　Do you think that having EMTs rotating on site has
8　improved CBP's medical responses for travelers?
9　**A.　Yes.**
10　Q.　Why?
11　**A.　Don't have to wait on an EMS to show if there's a**
12　**medical problem.**
13　Q.　Okay.  And prior to the CBP system of having EMTs on
14　site, can you describe what the process was for
15　procuring medical help for travelers?
16　**A.　We would call 911 I believe.**
17　Q.　And what happened when you called 911?  Would there be
18　a delay?
19　**A.　I've never called 911 myself.**
20　Q.　So you personnel have ever called 911 in your
21　responsibilities as a CBP officer?
22　**A.　That's correct.**
23　Q.　Have you ever been part of a group of CBP officers
24　where one of the officers called 911 related to a
25　medical emergency?

58

1　**A.　No.**
2　Q.　Have you heard complaints prior to CBP having EMTs on
3　site about their response times to 911 calls?
4　**A.　No.**
5　Q.　Is there a protocol about how CBP officers are to
6　respond to medical complaints by travelers?
7　**A.　I don't know if there is a formal protocol.**
8　Q.　Okay.  Have you ever encountered a situation where a
9　traveler was requesting medical assistance?
10　**A.　Yes.**
11　Q.　And what have you done?
12　**A.　I went to the supervisor with the information.**
13　Q.　Approximately how many times has that happened?  Is it
14　like a once a month thing?  A once a year thing?
15　**A.　Once every three, four years maybe.**
16　Q.　Okay.
17　**A.　For myself personally.**
18　Q.　What situations do you remember where a traveler has
19　requested or needed medical assistance?
20　**A.　The last time that I'm aware of is actually with**
21　**Elhady.**
22　Q.　So since Elhady in 2015, you are not aware of -- Let
23　me scratch that.  Since Elhady in 2015, you have not
24　been personally involved in a situation where a
25　traveler requested medical attention from CBP?

59

1　**A.　That is correct.**
2　Q.　Before Elhady were you personally involved in any
3　medical situations with travelers in CBP?
4　**A.　Not that I can recollect.**
5　Q.　Is it CBP's practice to always call either their on-
6　site EMT or 911 if a traveler requests medical
7　assistance?
8　**A.　Yes.**
9　Q.　Does -- Okay.  We're going to talk about Elhady now.
10　　　　MS. HOMER:  Can you mark Exhibit 3?
11　　　　MARKED FOR IDENTIFICATION:
12　　　　DEPOSITION EXHIBIT 3
13　　　　11:41 a.m.
14　BY MS. HOMER:
15　Q.　Okay.  Mr. Rocky, do you recognize this picture?
16　A.　No.
17　Q.　Do you recognize the face of the person in this
18　picture?
19　A.　No.
20　Q.　Do you have any memory of any interactions with the
21　individual in this picture?
22　A.　No.
23　Q.　Okay.  Set it aside.  Do you know who Anas Elhady is?
24　A.　Yes.
25　Q.　And how do you know Anas Elhady?

60

1　A.　I encountered him in 2015 as an officer.
2　Q.　And describe to me what you remember at a high level
3　about that encounter?
4　A.　I encountered him while doing a cell check.  He
5　requested medical assistance and we had him taken to
6　the hospital.
7　Q.　Okay.  So a cell check.  Is this what we were talking
8　about earlier, where CBP officers check in every 15
9　minutes?
10　A.　Yes.
11　Q.　Do you remember seeing his detention log during that
12　cell check?
13　A.　Yes.
14　Q.　And do you remember anything about that detention log?
15　Was it filled out?
16　A.　I don't remember details.  I remember that I would
17　have put my name down on there and put the time and
18　requested medical assistance.
19　Q.　But you don't remember any of the other specific
20　times --
21　A.　No.
22　Q.　-- on the log?
23　A.　No.
24　Q.　Or any of the other officers who may have been on the
25　log?

Transcript of Scott Rocky
Conducted on September 27, 2019

---

61

1   A.   No.
2   Q.   You testified earlier that you usually came on shift
3        around 6:00 a.m.?
4   A.   Yes.
5   Q.   Do you remember when in your shift you performed the
6        cell check on Anas Elhady?
7   A.   It would have been right at the beginning of my shift.
8   Q.   And when you say right at the beginning, like within
9        the first 15 minutes?
10  A.   Within the first 15 minutes.
11  Q.   What do you remember from the moment you performed the
12       check?
13  A.   Right when I performed the check?
14  Q.   Yeah.  Like did you look in through the window?  Did
15       you open the door?
16  A.   I looked in through the window.  "How are you doing?"
17       He said his back was hurting, and I asked him if he
18       needed to see a doctor, and he said yes.
19  Q.   Did he say anything other than his back hurting that
20       you remember?
21  A.   No.
22  Q.   Did you talk to him through the window?
23  A.   Yes.
24  Q.   Okay.  Did you open the door?
25  A.   No.

---

62

1   Q.   So after Mr. Elhady said he needed to see a doctor,
2        what did you do?
3   A.   I want to the supervisors and informed them.
4   Q.   Who were the supervisors at the time?
5   A.   I couldn't tell you who the supervisor was on shift at
6        that point.
7   Q.   And how did the supervisor respond to you saying that
8        Mr. Elhady needed medical attention?
9   A.   They said that we can get him medical attention but
10       let him know that he'll probably be out of here in ten
11       minutes, ten, 15 minutes.
12  Q.   And what did they mean by out of here?
13  A.   That his detention would be over and he would be
14       released.
15  Q.   Do you have any idea why his detention was going to be
16       over in ten to 15 minutes?
17  A.   Specifically, no.
18  Q.   Do you have any like general understanding as to why
19       his detention would be over in ten to 15 minutes?
20  A.   Probably because it was getting closed out.
21  Q.   And do you know why his detention would be getting
22       closed out?
23  A.   Because they were done with whatever they were working
24       on.
25  Q.   Do you know what they were working on?

---

63

1   A.   At that point I did not.
2   Q.   Did you later come to learn what other CBP officers
3        had been working on with respect to Mr. Elhady?
4   A.   Yes.
5   Q.   What had they been working on with respect to Mr.
6        Elhady?
7            MR. GOULDING:  The answer to that question
8        may be privileged so I'm going to direct you -- I'm
9        going to assert the privilege and I'm going to direct
10       you not to answer that or at least to -- We can step
11       outside and I can preview the answer and advise you if
12       there's any part that you can answer.
13           MS. HOMER:  Let's take a quick break for
14       you to do that.
15           MR. GOULDING:  Okay.
16           (Off the record at 11:47 a.m.)
17           (Back on the record at 11:48 a.m.)
18           MR. ANCHILL:  We're back on the record.  We
19       have previewed the witness's answer and it's
20       privileged.
21           MR. GOULDING:  That's correct.  The agency
22       is asserting the law enforcement privilege and has
23       directed the witness not to answer.
24           MS. HOMER:  Okay.
25  BY MS. HOMER:

---

64

1   Q.   And are you going to follow your counsel's instruction
2        and not answer?
3   A.   (Indicating in the affirmative).
4   Q.   Can you say yes verbally?
5   A.   Yes.  Sorry.
6   Q.   Thank you.  After you told the CBP supervisor on duty
7        that Mr. Elhady needed medical attention, what
8        happened?
9   A.   The supervisor told me that we can get him to the
10       hospital but that he would be released in probably
11       ten, 15 minutes.
12  Q.   Did you relay that message, that his release was
13       imminent, to Mr. Elhady?
14  A.   Yes, I did.
15  Q.   And how did Mr. Elhady respond?
16  A.   He said he wanted to go to the hospital.
17  Q.   Okay.  And what happened next?
18  A.   I went back down, told the supervisor.  They called
19       EMS.
20  Q.   After EMS was called, did you then go back to Mr.
21       Elhady?
22  A.   I'm not sure.
23  Q.   Okay.  Let me start over.  After EMS was called --
24       Well, let me back up.  Do you remember who placed the
25       phone call to EMS?

---

Transcript of Scott Rocky
Conducted on September 27, 2019

65

1   A.   It would have been a supervisor that was on shift.
2   Q.   What did you do after the phone call was placed to
3        EMS?
4   A.   To the best of my recollection, I went down there and
5        informed him that EMS was on the way.
6   Q.   Did Mr. Elhady remain in the holding cell while EMS
7        was on its way?
8   A.   Yes.
9   Q.   At what point was Mr. Elhady removed from the holding
10       cell?
11  A.   When EMS arrived on site, they would have gone back to
12       the cell.  I believe at that point I wasn't in the
13       building to know the exact --
14  Q.   Okay.  Did you personally let Mr. Elhady out of the
15       holding cell?
16  A.   No.
17  Q.   Did you personally interact with Mr. Elhady as he was
18       leaving the holding cell and being handed over to EMS?
19  A.   No.
20  Q.   After Mr. Elhady was removed from the holding cell,
21       did you have more interactions with Mr. Elhady?
22  A.   Direct interaction?
23  Q.   I mean, yes.
24  A.   No.
25  Q.   Okay.  Did you accompany Mr. Elhady to the hospital?

66

1   A.   I followed the ambulance.
2   Q.   Okay.  Who assigned you to follow the ambulance?
3   A.   It would have been whatever supervisor was on at that
4        point.
5   Q.   Were you in your own vehicle or a CBP vehicle?
6   A.   I was in a CBP vehicle.
7   Q.   What type of vehicle was it?
8   A.   It was a transport van.
9   Q.   Was there a specific make and model of the CBP
10       transport vans?
11  A.   I couldn't tell you.
12  Q.   Was anyone else in the vehicle with you?
13  A.   No.
14  Q.   Were there any CBP officers in the ambulance with Mr.
15       Elhady?
16  A.   Yes.
17  Q.   Do you remember their names?
18  A.   Yes.
19  Q.   What were their names?
20  A.   That would have been Officer Kehr.
21  Q.   Okay.  So to your knowledge there was one CBP officer
22       in the ambulance with Mr. Elhady?
23  A.   Yes.
24  Q.   And that was Officer Kehr?
25  A.   Correct.

67

1   Q.   That's spelled K-e-h-r; right?
2   A.   Yes.
3   Q.   And what is your understanding as to why one CBP
4        officer was in the ambulance and you, another CBP
5        officer, were in a separate vehicle?
6   A.   Mr. Elhady was still under our detention and we had an
7        officer ride to make sure that he was safe, and I
8        followed because they have to get back to the port
9        somehow.
10  Q.   And by they did you mean --
11  A.   Officer --
12  Q.   -- the officer?
13  A.   Officer Elhady -- I'm sorry.  Officer Kehr and Elhady.
14  Q.   Now, where did you follow them to?
15  A.   Detroit Receiving Hospital.
16  Q.   Okay.  And then did you park outside Detroit Receiving
17       Hospital?
18  A.   Yes.
19  Q.   Did you go inside the hospital?
20  A.   Yes.
21  Q.   Did you interact with Mr. Elhady inside the hospital?
22  A.   No.
23  Q.   Did you wait in the lobby inside the hospital?
24  A.   No.
25  Q.   Okay.  What did you do inside the hospital?

68

1   A.   They took Mr. Elhady up to a private area.  Officer
2        Kehr and myself, we stayed outside the curtained area
3        that Mr. Elhady was in.
4   Q.   So Mr. Kehr did not go inside this private area with
5        Mr. Elhady either?
6   A.   I believe --
7   Q.   To your memory?
8   A.   I believe that when Mr. Elhady was transferred to the
9        hospital bed, that Officer Kehr went in to unlock
10       handcuffs and handcuff him to the hospital bed.
11  Q.   Was Mr. Elhady, to your knowledge, handcuffed inside
12       the ambulance?
13  A.   Yes.
14  Q.   Was Mr. Elhady handcuffed while transferring him from
15       the ambulance to inside the hospital?
16  A.   Yes.
17  Q.   Was Mr. Elhady handcuffed at all points while in the
18       hospital?
19  A.   Yes.
20  Q.   Was he handcuffed when he eventually left the hospital
21       to return to the Ambassador Bridge?
22  A.   Yes.
23  Q.   Did you personally witness any of the medical
24       treatment Mr. Elhady received while at Detroit
25       Receiving Hospital?

Transcript of Scott Rocky
Conducted on September 27, 2019

---

69

1   A.   From my angle, I could see a very limited view inside
2        the curtained area.
3   Q.   Could you hear nurses or doctors talking to Mr.
4        Elhady?
5   A.   I could hear the doctor.
6   Q.   Do you remember which doctor it was?
7   A.   No.
8   Q.   Do you remember what, like the gist of the
9        conversation that the doctor had with Mr. Elhady?
10  A.   "Push your feet down against my hands.  Press your
11       legs up towards the ceiling against my hands."
12  Q.   Did you hear any of Mr. Elhady's descriptions of his
13       medical problems to the doctor?
14  A.   No.
15  Q.   Did you hear any diagnoses from the doctor to Mr.
16       Elhady?
17  A.   No.
18  Q.   Do you remember approximately how long Mr. Elhady was
19       at the hospital?
20  A.   Not off the top of my head.
21  Q.   Was Mr. Elhady eventually released from the hospital?
22  A.   Yes.
23  Q.   And how did he get back to the Ambassador Bridge?
24  A.   In our detention van or transport van.
25  Q.   This is the van that you had driven over?

---

70

1   A.   Yes.
2   Q.   Is -- is the van like separated?  Is there a wall
3        between the drivers and the people in the back?
4   A.   Yes.
5   Q.   Okay.  So you were in the front driving?
6   A.   Yes.
7   Q.   Was Mr. Kehr and Mr. Elhady in the back?
8   A.   Officer Kehr would have been in the front seat with
9        me.
10  Q.   Okay.  Officer Kehr was in the front seat with you
11       while you were driving?
12  A.   Correct.
13  Q.   And then there's a wall?
14  A.   Yes.
15  Q.   That I assume is for the security of the officers?
16  A.   Right.
17  Q.   And then Mr. Elhady was in the back?
18  A.   Yes.
19  Q.   Was Mr. Elhady handcuffed in the back?
20  A.   Yes.
21  Q.   Was anyone else with Mr. Elhady in the back?
22  A.   No.
23  Q.   Then you arrived back at the Ambassador Bridge;
24       correct?
25  A.   Correct.

---

71

1   Q.   Then what happened?
2   A.   To the best of my ability to recall, we pulled up next
3        to his vehicle and let him know he was free to go.
4   Q.   And how had you become aware that he was free to go?
5   A.   I think Officer Kehr contacted the port to let them
6        know we were on the way back.
7   Q.   And then, to your knowledge, the port told Mr. Kehr
8        that Mr. Elhady was free to go when he got back?
9   A.   Yes.
10  Q.   Did that happen while you were driving with Mr. Elhady
11       back to the port?
12  A.   I don't know if it was before we started up the van or
13       while we were on the way.  I don't recall.
14  Q.   During the transport back from the hospital to the
15       port, did you personally have any conversations with
16       Mr. Elhady?
17  A.   No.
18  Q.   Did Mr. Kehr have any conversations with Mr. Elhady?
19  A.   Not that I can recall.
20  Q.   Do you recall having any conversations with Mr. Elhady
21       while you were at the hospital?
22  A.   No.
23  Q.   Do you have any memory of Mr. Elhady complaining about
24       the holding cell itself he had been in?
25  A.   He may have said something about how hard the wooden

---

72

1        benches were.
2   Q.   Do you have any memory of Mr. Elhady complaining about
3        the cell being cold?
4   A.   No.
5   Q.   After you and Mr. Kehr let Mr. Elhady go, have you
6        ever interacted with Mr. Elhady again --
7   A.   No.
8   Q.   -- to your knowledge?  Do you remember the names of
9        any other CBP personnel that you interacted with
10       during the course of this interaction with Mr. Elhady?
11  A.   Do you mean the interaction going to the hospital?
12  Q.   Yeah.  That was a bad question.  Let me start over.
13       Okay.  So do you remember the names of any of the
14       supervisors you were communicating with about Mr.
15       Elhady on the day in question?
16  A.   At this time, no.
17  Q.   Okay.  Did you communicate with any government
18       officials that did not work for CBP about Mr. Elhady
19       on this day?
20            MR. GOULDING:  I'm going to -- I'm sorry.
21       Can you rephrase -- can you repeat it or --
22            MS. HOMER:  Yeah.
23  BY MS. HOMER:
24  Q.   Did you communicate with any government officials who
25       were not CBP employees about Mr. Elhady on the day of

---

73

1   this medical incident with Mr. Elhady?
2           MR. GOULDING: Objection, scope, law
3   enforcement privilege and I'll direct the witness not
4   to answer.
5   BY MS. HOMER:
6   Q.   You talked about earlier that you were familiar with
7        the TECS system?
8   A.   Yes.
9   Q.   Does TECS contain records of primary inspections?
10  A.   No.
11  Q.   Does TECS contain records from secondary inspections?
12  A.   Yes.
13  Q.   Have you previously reviewed any of the secondary
14       inspection TECS records related to Anas Elhady?
15  A.   Just the one that was forwarded to me.
16          MS. HOMER: Can we mark Exhibit 4?
17          MARKED FOR IDENTIFICATION:
18          DEPOSITION EXHIBIT 4
19          12:01 p.m.
20  BY MS. HOMER:
21  Q.   And then take a moment to flip through that. Have you
22       had a moment to review this?
23  A.   Yes.
24  Q.   Do you recognize this document?
25  A.   I'm sorry?

74

1   Q.   Do you recognize this document?
2   A.   Yes.
3   Q.   What is it?
4   A.   This is a TECS printout.
5   Q.   And who is the TECS printout of, or about?
6   A.   Mr. Elhady.
7   Q.   And have you reviewed this TECS printout before?
8   A.   Yes.
9   Q.   You see that throughout this TECS printout there are
10       black bars?
11  A.   Yes.
12  Q.   What do you understand those black bars to be?
13  A.   Redacted information.
14  Q.   Have you ever seen a version of Anas Elhady's TECS
15       report that did not have this information?
16  A.   I don't remember.
17  Q.   Do you have any knowledge about -- for example, on
18       page 1, where it says Reason for Search and then it's
19       redacted below that, do you have any knowledge about
20       what that information on the Reason for Search might
21       be?
22          MR. GOULDING: I'll direct the witness he's
23       permitted to answer that only yes or no.
24          THE WITNESS: No.
25  BY MS. HOMER:

75

1   Q.   Do you have any knowledge about what any of the
2        information that is behind the black bars might be?
3   A.   No.
4   Q.   Reviewing this record, does it jigger any fresh
5        memories in you about what happened on April 11th,
6        2015 with respect to Mr. Elhady?
7   A.   Other than apparently I was the one that called back
8        to the Ambassador Bridge from the hospital, no.
9   Q.   So if you turn to -- it's the third physical piece of
10       paper and in the bottom right corner it says CBP-0241.
11       Do you see that page?
12  A.   Yes.
13  Q.   Okay. So you see at the top where it says that the
14       Referred Time was 1:43 Eastern Daylight Time?
15  A.   Yes.
16  Q.   See that? Would you have been on duty at that time?
17  A.   No.
18  Q.   Okay. To the best of your understanding, when would
19       you have reported for duty on this day?
20  A.   6:00 a.m.
21  Q.   Now, if you flip four more pages back to where it says
22       CBP-0244 in the bottom right corner.
23  A.   Yes.
24  Q.   Do you see that page? Okay. I'm looking about
25       halfway down the material that's printed on the page

76

1        right beneath the biggest black box where it says.
2        "Elhady complained of back pain, coldness and
3        requested Emergency Medical Services to be called."
4        Do you see that?
5   A.   Yes.
6   Q.   Does that refresh your recollection that Elhady was
7        also complaining of coldness?
8   A.   No.
9   Q.   You have no memory of Elhady complaining of coldness?
10  A.   No.
11  Q.   Did you write that sentence?
12  A.   No.
13  Q.   Is there any portion of this TECS record that was like
14       physically written by you?
15  A.   No.
16  Q.   Do you know who would have written up this report?
17  A.   I believe it would have been Officer Bradley.
18  Q.   And what is the basis for that belief?
19  A.   He is named on the front of the form, Created by
20       Officer.
21  Q.   And so based on your understanding of TECS records,
22       all of the like written memoranda contained within
23       this report was written by Officer Bradley?
24  A.   Yes.
25  Q.   Okay. So the next line underneath where Elhady was

**77**

1  complaining -- we're back on CBP-0244 -- it says,
2  "Watch Commander notified of Elhady's complaint." Do
3  you see that?
4  A.  Yes.
5  Q.  Were you the individual who notified the watch
6  commander?
7  A.  No.
8  Q.  Do you know who was the individual who notified the
9  watch commander?
10 A.  No.
11 Q.  Do you know who the watch commander was at the time?
12 A.  No.
13 Q.  Where in the CBP hierarchy does a watch commander
14 fall?
15 A.  In between a chief and an assistant port director I
16 believe.
17 Q.  Okay.  So you would have reported to a supervisor?
18 A.  Yes.
19 Q.  Would -- Is the name of the supervisor you reported to
20 anywhere in this document?
21 A.  I don't remember which supervisor I reported to so --
22 Q.  Okay.  But -- So there's a couple of supervisors that
23 I see that are listed so one of them is Tonya Lapsley.
24 But you don't remember if that was the supervisor you
25 reported Mr. Elhady's complaint to?

**78**

1  A.  No.
2  Q.  Okay.  If you flip -- Well, actually let me back up.
3  So, to your knowledge, would a supervisor have then
4  reported to the watch commander?
5  A.  Yes.
6  Q.  Okay.  And if you flip back to the second page of this
7  document where it says CBP-0240 in the bottom corner,
8  the last full paragraph states, "SCBPO Lapsley was
9  notified and assigned CBPO Bradley and CBPO Ferguson,"
10 and then some redactions, and then it says, "Watch
11 Commander Iverson was advised." Do you see that?
12 A.  Yes.
13 Q.  Does that inform you that the watch commander on duty
14 was Iverson?
15 A.  I don't know if Iverson was the watch commander when I
16 came on duty.
17 Q.  So the watch commander could have also shifted at 6:00
18 a.m.?
19 A.  Yes.
20 Q.  Okay.  But this informs you that Watch Commander
21 Iverson was on duty at the beginning of Elhady's
22 detention around 1:45 in the morning?
23 A.  According to this document.
24 Q.  Okay.  But you weren't there.  Okay.  So we're going
25 back to CBP-0244, about halfway through the document.

**79**

1  So the next sentence after the watch commander says,
2  "EMS called to respond to Detroit Ambassador Bridge."
3  Do you see that?
4  A.  Yes.
5  Q.  And then, as we discussed earlier, you did not
6  personally make the phone call to EMS; correct?
7  A.  Correct.
8  Q.  Do you know who did?
9  A.  No.
10 Q.  Right beneath that it says, "Hart Medical EMS arrived
11 at AMB." Do you see that?
12 A.  Yes.
13 Q.  And Hart Medical, they're an ambulance company?
14 A.  Yes.
15 Q.  Have you had any interactions with them besides this
16 day?
17 A.  No.
18 Q.  And then they arrived at AMB.  Does that mean
19 Ambassador Bridge?
20 A.  Yes.
21 Q.  Okay.  And then it says they arrived at -- sorry --
22 Hart Medical arrived, en route to Detroit Receiving
23 Hospital.  That's what you said earlier, is the
24 hospital Mr. Elhady was sent to was Detroit Receiving?
25 A.  Yes.

**80**

1  Q.  Then it says, "CBPO Kehr and CBPO Rocky as escorts at
2  0625 hours." Do you see that?
3  A.  Yes.
4  Q.  So 0625 would be approximately 25 minutes after you
5  got on shift?
6  A.  Yes.
7  Q.  And so this matches your recollection that you had
8  checked in on Elhady and asked for EMS to be called
9  very early in your shift?
10 A.  Yes.
11 Q.  Okay.  Then -- Were you in touch with the bridge
12 throughout Mr. Elhady's experience at Detroit
13 Receiving Hospital?
14 A.  I think Officer Kehr was making calls to check in.
15 Q.  Okay.  And how often were those calls being made?
16 A.  Off the top of my head I couldn't tell you how often.
17 Q.  Would it be fair to assume that kind of each of these
18 phrases in the report about when Elhady arrived at the
19 hospital, and then it says no status update, awaiting
20 medical care at 0740 -- when you see that section, is
21 that likely the result of Kehr giving updates back at
22 the bridge?
23 A.  Yes.
24 Q.  And then the next paragraph says, "CBPO Rocky called
25 and stated that Detroit Receiving Hospital physicians

Transcript of Scott Rocky
Conducted on September 27, 2019

---

81

1  released Elhady." Do you see that?
2  A.  Yes.
3  Q.  And that's where you said earlier that you think you
4     were the one who called because it says this?
5  A.  Yes.
6  Q.  Right?  But your initial memory was that Kehr was
7     doing the calling?
8  A.  Yes, because I was driving.
9  Q.  That makes sense.  And then it says that you with Kehr
10    and Elhady were back en route to the bridge at 9:10
11    hours; right?
12 A.  Yes.
13 Q.  And does that sound right to you, that the whole
14    incident was approximately three hours long?
15 A.  Yes.
16 Q.  And then right beneath that it says that you arrived
17    back at the Ambassador Bridge at 9:20.  Do you see
18    that?
19 A.  Yes.
20 Q.  And does that sound accurate?
21 A.  Yes.
22 Q.  And then it says Elhady was allowed to leave the CBP
23    facility at 9:25.  Do you see that?
24 A.  Yes.
25 Q.  And to your recollection he was allowed to leave just

82

1     by dropping him off at his car?
2  A.  To my recollection.
3  Q.  Okay.  But it's possible you took him back inside the
4     lobby for a minute?
5  A.  It's possible that either Officer Kehr or myself ran
6     in to check to make sure that he was okay to leave.
7  Q.  Okay.  But you have no memory of bringing him into the
8     lobby?
9  A.  No.
10 Q.  Do you have any memory of the moment when his
11    handcuffs were taken off?
12 A.  Nothing specific.
13 Q.  At any point during your involvement with Mr. Elhady's
14    medical treatment, did anyone at the bridge give you
15    an update about why Mr. Elhady was being detained?
16 A.  No.
17 Q.  At any point after Mr. Elhady's treatment, did you
18    learn why Mr. Elhady had been detained?
19       MR. GOULDING:  I'll object.  The witness,
20    you can answer yes or no to that, and if you could
21    please pause just for a half a second before you
22    answer these questions, that would be helpful.
23       THE WITNESS:  No.
24 BY MS. HOMER:
25 Q.  Did you come to learn in any form after this incident

83

1     why Mr. Elhady had been detained?
2        MR. GOULDING:  Same instruction.  You can
3     answer yes or no.
4        THE WITNESS:  Yes.
5  BY MS. HOMER:
6  Q.  How did you learn it?
7        MR. GOULDING:  You can answer how you
8     learned it provided it doesn't reveal the content of
9     what you learned.
10       THE WITNESS:  As a result of the case.
11    Elhady's case against us.
12 BY MS. HOMER:
13 Q.  Did you discuss Elhady's case with other CBP officers
14    after it was filed?
15 A.  Just in general terms.
16 Q.  Okay.  So when you say you learned after the case why
17    he had been detained, did you learn that from an
18    official CBP source or document or did you learn it
19    based on your own inference from the lawsuit itself?
20 A.  From the document that was provided to me.
21 Q.  And when you say the document, what document was that?
22 A.  The TECS printout.
23 Q.  Okay.  So at some point you have received a TECS
24    printout that has more information than the one I
25    provided you?

84

1  A.  I don't recall if it has more.
2  Q.  Is there anything in this TECS printout that you can
3     publicly see right now that indicates why Mr. Elhady
4     was detained?
5  A.  I'm sorry.  Could you restate the question?
6  Q.  Yeah.  Is there anything in this document, the TECS
7     report you have in front of you, that indicates why
8     Mr. Elhady was detained?
9        MR. GOULDING:  I'll again direct the
10    witness you can answer yes or no to that.
11       THE WITNESS:  Yes.
12 BY MS. HOMER:
13 Q.  What information are you looking at that indicates why
14    he was detained?  Can you point me to it in the
15    document?
16 A.  Officer experience.
17 Q.  What do you mean by officer experience?
18 A.  I can read the format and understand what was going
19    on.
20 Q.  Okay.  So there are -- Are there any literal words you
21    can read to me right now that would tell me why Elhady
22    was detained?
23 A.  No.
24 Q.  But based on the overall contents of the report and
25    your experience of a decade as a CBP officer, you have

85

1  a sense of why Elhady was detained; is that correct?
2  A.  Yes.
3  Q.  Okay.  Can you tell me what that sense is?
4          MR. GOULDING:  Objection, scope, law
5  information privilege and I'll direct the witness not
6  to answer.
7          MS. HOMER:  I was trying to be careful.
8          MR. GOULDING:  And you were until that last
9  one.
10 BY MS. HOMER:
11 Q.  Are you going to follow your counsel's instruction to
12    not tell me why Mr. Elhady was detained?
13 A.  Yes, I'm going to follow my counsel's direction.
14 Q.  Yeah.  It's generally a good idea to do what your
15    lawyers tell you.  Do you know Blake Bradley?
16 A.  Yes.
17 Q.  How well do you know Blake Bradley?
18 A.  I worked with him for a few years at the Ambassador
19    Bridge.
20 Q.  Did you work with Mr. Bradley in your capacity as a
21    counter-terrorism response officer?
22 A.  Directly, not that I can recall.
23 Q.  Do you remember what Blake Bradley's title was in
24    April of 2015?
25 A.  Customs and Border Protection officer.

86

1  Q.  Do you remember if he had any special designation
2    within that like counter-terrorism response officer?
3  A.  I believe he was also a counter-terrorism response
4    officer.
5  Q.  Do you have any understanding as to why Blake Bradley
6    was involved in the detention of Anas Elhady on April
7    11th, 2015?
8          MR. GOULDING:  Objection, scope, law
9  enforcement privilege and I'll direct the witness not
10    to answer.
11          THE WITNESS:  I'll listen to my counsel.
12 BY MS. HOMER:
13 Q.  Thank you.  Did you ever step inside the cell Anas
14    Elhady was being detained in on April 11th, 2015?
15 A.  Not that I can recall.
16 Q.  Have you, since April 11th, 2015, ever seen a record
17    of the detention log for Mr. Elhady from that day?
18 A.  No.
19 Q.  Do you have any memory of that detention log
20    reflecting that Mr. Elhady had not been checked in on
21    in regular 15 minute increments?
22          MR. ANCHILL:  I'm going to object.  Asked
23    and answered.
24 BY MS. HOMER:
25 Q.  You can still answer.

87

1  A.  No.
2  Q.  Have you ever had any other individual, other than
3    Anas Elhady, complain about back pain while detained
4    in an Ambassador Bridge cell?
5  A.  No.
6  Q.  Have you ever had any individual complain about how
7    cold the cell was?
8  A.  No.
9  Q.  Following this April 11th, 2015 incident with Mr.
10    Elhady, but before this lawsuit, has anyone at CBP
11    discussed Mr. Elhady's experience with you?
12 A.  No.
13          MR. ANCHILL:  I'm going to object to
14    foundation.
15          THE WITNESS:  I'm sorry.  Apologize.
16          MR. ANCHILL:  Foundation.  Go ahead.  You
17    can answer.
18          THE WITNESS:  No.
19 BY MS. HOMER:
20 Q.  Are you aware of any changes to the furnishings of a
21    holding cell since 2015?
22 A.  No.
23 Q.  Are you aware of any changes to the lighting in the
24    holding cells since 2015?
25 A.  No.

88

1  Q.  Are you aware of any changes to the HVAC system that
2    feeds the holding cells since 2015?
3  A.  No.
4  Q.  You mentioned earlier that this I-216 form was
5    introduced after 2015; is that correct?
6  A.  Yes.
7  Q.  And you mentioned earlier that the paper form I showed
8    you is no longer in use?
9  A.  Correct.
10 Q.  And that's because there's now a computerized
11    detention system form?
12 A.  Yes.
13 Q.  Other than the change in form, has there been any
14    change to CBP's detention protocols that you're aware
15    of since April 2015?
16 A.  No.
17 Q.  On April 11, 2015, was Mr. Elhady under any form of
18    criminal investigation?  To your knowledge?
19          MR. GOULDING:  Objection, scope, law
20    enforcement privilege, and I'll direct the witness not
21    to answer.
22          THE WITNESS:  I'll listen to my counsel.
23 BY MS. HOMER:
24 Q.  Okay.  On April 11th, 2015, was there an outstanding
25    warrant for Mr. Elhady's arrest, to your knowledge?

Transcript of Scott Rocky
Conducted on September 27, 2019

23 (89 to 92)

89

1  A.  No.
2  Q.  On April 11th, 2015, to your knowledge, was any
3      contraband on found on Mr. Elhady or in his vehicle?
4  A.  No.
5  Q.  Do your interactions with Mr. Elhady from April 2015
6      stand out as unusual in any way?
7  A.  Yes.
8  Q.  Why?
9          MR. GOULDING:  I'll direct the witness that
10     if you can answer that without revealing law
11     enforcement privilege, you may.  Otherwise you may
12     not, and if you'd like to step out, we can preview the
13     answer.
14         THE WITNESS:  Can we step out?
15         MR. GOULDING:  Yes.
16     (Off the record at 12:29 p.m.)
17     (Back on the record at 12:32 p.m.)
18         MS. HOMER:  We can go back on the record.
19     Can you read back that last question?
20     (The following portion of the record was
21     read by the reporter at 12:32 p.m.:
22     Q.  "Do your interactions with Mr. Elhady
23     from April 2015 stand out as unusual in any
24     way?
25     A.  Yes.

90

1      Q.  Why?")
2          MR. GOULDING:  For the record, agency
3      counsel has previewed the answer.  It does not contain
4      privileged information and the witness is permitted to
5      answer.
6          THE WITNESS:  Because he requested medical
7      attention.
8  BY MS. HOMER:
9  Q.  And in your experience individuals requesting medical
10     attention at the border is relatively rare?
11 A.  Yes.
12 Q.  What other experiences have you had as a CBP officer
13     at the Ambassador Bridge that stand out as
14     particularly unusual or extraordinary?
15         MR. GOULDING:  I'll give the witness the
16     same instructions.  It's a broad question.  To the
17     extent anything unusual or extraordinary involves law
18     enforcement privileged information, you cannot reveal
19     it.  If there's any doubt in your mind, we'll again go
20     out and talk about it.
21         MR. ANCHILL:  And I'll object based on
22     form.  It assumes that there was something else
23     extraordinary that occurred during his time working as
24     an officer.
25         THE WITNESS:  Step out?

91

1          MR. GOULDING:  Yes.
2      (Off the record at 12:33 p.m.)
3      (Back on the record at 12:34 p.m.)
4  BY MS. HOMER:
5  Q.  Okay.  I will break the question into two to override
6      Ben's form objection.  So here's a yes or no question.
7      In your job responsibilities as a CBP officer at the
8      Ambassador Bridge, have there been any other
9      experiences that stand out to you as unusual or
10     extraordinary?
11 A.  Yes.
12 Q.  Can you tell me what some of those experiences are?
13 A.  Yes.
14 Q.  Go ahead.
15 A.  I've seized drugs, illegal drugs from various
16     celebrities that have crossed the border.
17 Q.  Can you tell me which celebrities?
18 A.  No.
19 Q.  Have you had anything else other than seizing drugs
20     from celebrities that you remember as particularly
21     unusual or extraordinary?
22 A.  Truck driver having a heart attack and running into
23     the wall and being ejected from his truck.
24 Q.  Is that another --
25 A.  That's down in the secondary -- or down in the

92

1      Ambassador Bridge Company parking area, or driving
2      area.  The access roads for the bridge.
3  Q.  And how did you respond to that truck driver being,
4      having a heart attack?
5  A.  I did not respond.
6  Q.  Did you see it happen?
7  A.  Heard.
8  Q.  Heard.  And who responded?
9  A.  Various officers.
10 Q.  And was medical attention called immediately?
11 A.  Yes.
12 Q.  Aside from hearing it happen, did you have any
13     involvement in that incident?
14 A.  No.
15 Q.  Okay.  Has there ever been anything particularly
16     violent that has occurred in the course of your
17     responsibilities as a CBP officer at the Ambassador
18     Bridge?
19 A.  To me personally?
20 Q.  In your vicinity that you're aware of.
21 A.  Not while I've been on shift.
22 Q.  Has there been a violent incident that's happened when
23     you weren't on shift?
24 A.  Yes.
25 Q.  Did you personally witness it?

Transcript of Scott Rocky
Conducted on September 27, 2019

---

**93**

1  A.  No.
2  Q.  Okay.  Is this a violent incident that happened at the
3      bridge that you're just aware of?
4  A.  Yes.
5  Q.  What was that incident?
6  A.  **A few years ago there was a shooting.  Maybe five, six**
7      **years ago.**
8  Q.  Has anyone ever pulled a weapon on you while you have
9      been on duty as a CBP officer at the Ambassador
10     Bridge?
11 A.  No.
12 Q.  Have you ever confiscated a weapon from someone while
13     you were on duty?
14 A.  Yes.
15 Q.  Do those moments of confiscating a weapon stand out to
16     you or are they ordinary?
17 A.  **It stands out to me.**
18 Q.  Approximately how many times has that happened?
19 A.  **That I've taken a weapon off of an individual?**
20 Q.  Yeah.
21 A.  **Just a few times.**
22 Q.  Did you feel threatened during those interactions when
23     you took a weapon off of an individual?
24 A.  No.
25 Q.  Was the individual complying with your instructions?

---

**94**

1  A.  Yes.
2  Q.  Have you ever dealt with someone who was particularly
3      combative or aggressive towards you as a CBP officer?
4  A.  No.
5  Q.  Have you ever personally been involved in a situation
6      as a CBP officer that you felt was dangerous?
7  A.  **Every day is potentially dangerous.**
8  Q.  Have you ever felt like a situation was escalating or
9      could turn violent?
10 A.  **Again, every situation could turn violent.**
11 Q.  Okay.  Has there ever been a moment as a CBP officer
12     that you have been afraid for your safety, like a
13     heightened level?
14 A.  No.
15 Q.  Am I correct that one of the missions of CBP is to
16     deter and prevent terrorism?
17 A.  Yes.
18 Q.  Have you ever interacted with someone you thought
19     might be a terrorist at the border?
20     MR. GOULDING:  Objection, scope, law
21     enforcement privilege and I'll direct the witness not
22     to answer.
23     THE WITNESS:  I'll listen to counsel.
24 BY MS. HOMER:
25 Q.  Has there ever been an individual who you were interacting

---

**95**

1      with at the border who you considered to present a
2      higher risk of violence towards you or the country?
3  A.  **I don't understand your question.**
4  Q.  Does CBP rank travelers according to their risk?
5      Actually that's a bad question.  Does CBP ever
6      designate travelers as higher risk than other
7      travelers?
8      MR. GOULDING:  Objection, scope, law
9      enforcement privilege and I'll direct the witness not
10     to answer.
11     THE WITNESS:  I'll listen to counsel.
12 BY MS. HOMER:
13 Q.  Has there ever been an interaction you've had with any
14     traveler that has just caused you to be on higher
15     alert than you ordinarily are in the course of your
16     duties?
17 A.  **I'm always on alert during the course of my duties.**
18 Q.  Have you ever been disciplined as a CBP officer?
19 A.  **Not that I can recall.**
20     MS. HOMER:  I think I'm done.  I am done.
21     I have no further questions.
22     EXAMINATION
23 BY MR. ANCHILL:
24 Q.  Good afternoon, Officer Rocky.
25 A.  **Good afternoon.  Is it that time already?**

---

**96**

1      MR. CARTY:  It is.
2  BY MR. ANCHILL:
3  Q.  You testified that you worked overtime as a CBP
4      officer; correct?
5  A.  **I have, yes.**
6  Q.  Did you work overtime on April 11th, 2015?
7  A.  **I don't recall but the schedule shows that I did not.**
8  Q.  You were working the 6:00 a.m. shift on April 11,
9      2015?
10 A.  **Yes.**
11 Q.  And you were asked to check on Mr. Elhady shortly
12     after your 6:00 a.m. shift started; is that correct?
13 A.  **Yes.**
14 Q.  If the EMS records say they were dispatched at 6:11,
15     do you have any reason to believe that time is wrong?
16 A.  **No.**
17 Q.  If EMS was dispatched at 6:11, would that mean that
18     you checked on Mr. Elhady almost immediately upon
19     starting your shift?
20 A.  **Yes.**
21 Q.  The TECS report says that you and Officer Kehr were
22     escorts for Mr. Elhady at 6:25.  Does that mean that
23     the ambulance arrived before that?
24 A.  **Most likely.**
25 Q.  What's the first memory you have of seeing Mr. Elhady?

Transcript of Scott Rocky
Conducted on September 27, 2019

97

1  A.  Seeing him in the cell and when I was doing the
2     welfare check.
3  Q.  Shortly after your shift started, your 6:00 a.m. shift
4     started?
5  A.  Yes.
6  Q.  When you first saw Mr. Elhady, how was he positioned?
7  A.  I can't recall if he was standing or sitting.
8  Q.  Was he conscious?
9  A.  Yes.
10 Q.  Before seeing him, did you hear him yelling?
11 A.  No.
12 Q.  Did you hear any voice at all coming from the cells
13    before seeing Mr. Elhady that morning?
14 A.  No.
15 Q.  What did Mr. Elhady look like generally when you first
16    saw him?
17 A.  Young adult.
18 Q.  Did he appear to be in any kind of medical distress or
19    crisis?
20 A.  Not that I could determine.
21 Q.  Was he shaking or shivering?
22 A.  No.
23 Q.  Did he tell you that he had passed out?
24 A.  No.
25 Q.  Did he tell you that he had a headache?

98

1  A.  No.
2  Q.  Did he complain about being cold?
3  A.  No.
4  Q.  Did he say anything about the cell temperature?
5  A.  No.
6  Q.  What did he say to you?
7  A.  His complaint was that his back hurt and I asked him
8     if he wanted EMS at that time.
9  Q.  And then what did you do?
10 A.  Well, he stated that he wanted to go to the hospital
11    so I went and told the supervisors at that point.
12 Q.  And how did the supervisor respond?
13 A.  Said that we can have him taken to the hospital but
14    let him know that if he doesn't go, he'll be out of
15    here in ten, 15 minutes.
16 Q.  So the ambulance was summoned; correct?
17 A.  Yes.
18 Q.  Officer Kehr testified that when Mr. Elhady arrived at
19    the ambulance, he had his shoes and jacket. Do you
20    have any recollection of whether Mr. Elhady had his
21    shoes and jacket?
22 A.  No. I do not.
23 Q.  Did you receive any instructions about transporting
24    Mr. Elhady to the hospital?
25 A.  Not that I can recall.

99

1  Q.  Did someone instruct you to handcuff him?
2  A.  They may have instructed Officer Kehr. I was most
3     likely at that point, I was getting the transport van
4     to follow.
5  Q.  In the time that you were with Mr. Elhady, did you
6     ever hear him voice any complaints about his
7     handcuffs?
8  A.  No.
9  Q.  Were there EMTs that you saw?
10 A.  Yes.
11 Q.  Do you recall their genders?
12 A.  I believe one was male and one was female. I know at
13    least one was female.
14 Q.  Do you remember anything about the EMT in the back of
15    the ambulance?
16 A.  I believe that was the female.
17 Q.  Do you have any memory of any interactions between
18    Officer Kehr and the EMT?
19 A.  No.
20 Q.  When the ambulance got to the hospital, did you
21    observe any tension between Officer Kehr and the EMT?
22 A.  No.
23 Q.  If you had observed tension between Officer Kehr and
24    the EMT, do you think you'd remember that?
25 A.  Yes.

100

1  Q.  Why is that?
2  A.  That would be unusual.
3  Q.  Do you remember any interactions between yourself and
4     any of the hospital nurses?
5  A.  Nothing specific, no.
6  Q.  Do you remember any interactions between Officer Kehr
7     and any of the hospital nurses?
8  A.  No.
9  Q.  Do you remember any interactions between yourself and
10    any of the hospital doctors?
11 A.  Just the doctor that examined Officer Elhady. Or Mr.
12    Elhady. Sorry.
13 Q.  And what do you recall?
14 A.  The doctor asked me what was going on with Mr. Elhady,
15    and I said he was complaining of back pain.
16 Q.  Do you remember any interactions between Officer Kehr
17    and any of the hospital doctors?
18 A.  No.
19 Q.  Did you get into an argument with one of the nurses?
20 A.  No.
21 Q.  Did you get into an argument with one of the doctors?
22 A.  No.
23 Q.  If you had gotten into an argument with one of the
24    nurses or doctors, is that something you'd remember?
25 A.  Yes.

Transcript of Scott Rocky
Conducted on September 27, 2019

26 (101 to 104)

---

101

1   Q.   Why is that?
2   A.   It would be unusual.
3   Q.   Did you observe Officer Kehr getting into an argument
4        with one of the nurses?
5   A.   No.
6   Q.   Did you observe Officer Kehr getting into an argument
7        with one of the doctors?
8   A.   No.
9   Q.   If you had observed Officer Kehr getting into an
10       argument with one of the nurses or doctors, would you
11       remember that?
12  A.   Yes.
13  Q.   Why?
14  A.   It would be unusual.
15  Q.   You testified that there's no camera in the cells at
16       the Ambassador Bridge; correct?
17  A.   Yes.
18  Q.   Are you sure?
19  A.   Yes.
20  Q.   And they also did not have a camera in 2015; is that
21       correct?
22  A.   That's correct.
23  Q.   And you testified they had a water fountain?
24  A.   Yes.
25  Q.   You testified that the thermostat that covers the cell

---

102

1        area also covers additional areas in the building
2        where officers are present; correct?
3   A.   Yeah.
4   Q.   Is there any way that someone could make just the
5        detention cells cold but not the other areas?
6   A.   No.
7   Q.   Can a nonsupervisory officer adjust the thermostat?
8   A.   No.
9   Q.   Why is that?
10  A.   Well, the supervisors are the ones that have the
11       access to the key to unlock boxes that cover the
12       thermostats.
13  Q.   Have you ever adjusted the thermostat in the building?
14  A.   No.
15  Q.   Have you ever had custody to the key to the box
16       enclosing the thermostat?
17  A.   No.
18  Q.   Has anyone ever complained to you about dangerously
19       cold conditions in the detention cells at the
20       Ambassador Bridge?
21  A.   No.
22  Q.   Has anyone ever complained to you about the cell
23       lights being too bright?
24  A.   No.
25  Q.   When you interview a traveler that's detained in a

---

103

1        detention cell, where do you conduct that interview?
2   A.   If they're being detained in a detention cell, we
3        would remove them from that and bring them to one of
4        the interview rooms.
5   Q.   So outside the cell?
6   A.   Yes.
7   Q.   Is that always the case?
8   A.   Except for maybe a short question of what's your name
9        or what's your birth date, they would always be
10       removed for questioning.  Or interview, rather.
11  Q.   Has a traveler or a detainee ever asked you for a
12       blanket or a jacket because they were cold?
13  A.   No.
14  Q.   If they did, if they had, would you remember that?
15  A.   Probably.
16  Q.   If you heard a traveler or detained person screaming
17       for help from a detention cell, what would you do?
18  A.   I would probably let supervisors know that he's
19       screaming for help and then go check on him if nobody
20       else had gotten up to go check on him.
21  Q.   Has that ever happened?
22  A.   Not to my recollection.
23  Q.   Is that something you'd remember had it happened?
24  A.   Yes.
25  Q.   If you personally observed a traveler or detainee in

---

104

1        need of medical attention, what would you do?
2   A.   I would definitely let supervisors know.  If it was
3        something that required immediate first aid attention,
4        I would probably try to do that, you know, if they're
5        bleeding or something.
6   Q.   Have you ever been part of a conspiracy by CBP
7        officers to harm or torture a detainee?
8   A.   No.
9            MS. HOMER:  Objection, calls for a legal
10       conclusion.
11  BY MR. ANCHILL:
12  Q.   What's the answer?
13  A.   No.
14  Q.   Are you aware of any way that the detention cells can
15       be chilled to a dangerously low temperature?
16  A.   No.
17  Q.   What would you do if you were approached about a plan
18       to chill a detention cell to a dangerously low
19       temperature and then put somebody in it?
20           MS. HOMER:  Objection, calls for
21       speculation.
22           THE WITNESS:  I would definitely let
23       somebody know.  Whether a supervisor or watch
24       commander, somebody would know.
25  BY MR. ANCHILL:

---

Transcript of Scott Rocky
Conducted on September 27, 2019

105

1  Q.  Would you remember it if you were approached with a
2     plan like that?
3  A.  Yes.
4  Q.  How do you know you'd remember that?
5  A.  That would be so unusual as to be -- it would stick in
6     my mind forever.
7  Q.  Have you ever done anything to hide your identity
8     while working as a CBP officer?
9  A.  No.
10 Q.  Have you ever refused to identify yourself when a
11    member of the public asks your name?
12 A.  No.
13 Q.  Do you wear a uniform while you're on duty?
14 A.  Yes, I do.
15 Q.  Always?
16 A.  Always.
17 Q.  Does the uniform have your name on it?
18 A.  Yes, it does.
19 Q.  You testified that when you checked on a detained
20    person at the bridge, you would record it on a log; is
21    that correct?
22 A.  Yes.
23 Q.  And in 2015 that was a paper log?
24 A.  Yes.
25 Q.  Whose responsibility was it to maintain that log?

106

1  A.  While the case was in progress, that would be the case
2     officer.
3  Q.  And what about after that?
4  A.  I don't know.
5  Q.  Was it ever your responsibility?
6  A.  No.
7  Q.  When you're securing a detainee in a detention cell,
8     do you take away the detainee's jacket?
9  A.  We would take off everything to their basilar, like
10    whether it was a T-shirt or sweater.  For pat-down
11    purposes that would all be removed.
12 Q.  So that would include a jacket?
13 A.  Yes.
14 Q.  Would you always take away a jacket?
15 A.  Yes.
16 Q.  You testified that there's a bench in the detention
17    cells; is that correct?
18 A.  Yes.
19 Q.  And that the bench is made of wood and metal?
20 A.  Yes.
21 Q.  What's the part of the bench that you sit on made out
22    of?
23 A.  Wood.
24        MR. ANCHILL:  Let's take a quick break.
25        (Off the record at 12:55 p.m.)

107

1         (Back on the record at 12:58 p.m.)
2  BY MR. ANCHILL:
3  Q.  Do you have any knowledge as to whether the EMTs came
4     inside the building to get Mr. Elhady or if Mr. Elhady
5     came out to them?
6  A.  No, I do not.
7  Q.  Why is that?
8  A.  At that time I would have been getting the detention
9     van so I wouldn't have been in the area.
10        MR. ANCHILL:  Thank you.  I have nothing
11    further.
12        RE-EXAMINATION
13 BY MS. HOMER:
14 Q.  Okay.  I just have a few more questions.  You didn't
15    personally interview Mr. Elhady to determine any of
16    the contents of that TECS report, did you?
17 A.  No.
18 Q.  You weren't on shift yet?
19 A.  No.
20 Q.  And you did talk with Mr. Elhady about his need for
21    medical attention through the door; correct?
22 A.  Yes.
23 Q.  But you don't remember that conversation verbatim, do
24    you?
25 A.  No.

108

1  Q.  It was more than four years ago?
2  A.  Yes.
3  Q.  Between Mr. Elhady requesting medical attention and
4     leaving the Ambassador Bridge in an ambulance, did you
5     personally return any personal items to Mr. Elhady?
6  A.  No.
7  Q.  You mentioned a case officer earlier.  Who was the
8     case officer?
9  A.  The officer that would have been conducting the
10    interviews.
11 Q.  And is that different than a supervisor?
12 A.  Yes.
13 Q.  Do you know who the case officer was with respect to
14    Mr. Elhady?
15 A.  TECS record shows that it was Officer Bradley.
16 Q.  Do you remember whether Elhady was in detention cell
17    one or detention cell two?
18 A.  He -- I believe he was in detention cell one.
19 Q.  But you're not sure?
20 A.  Not completely sure but most likely number one.
21 Q.  Okay.
22        MS. HOMER:  That's it.  Those are my
23    questions.
24        MR. ANCHILL:  Nothing further here.
25        THE WITNESS:  Okay.

Transcript of Scott Rocky
Conducted on September 27, 2019

109

1    (The deposition was concluded at 1:01 p.m.
2    Signature of the witness was not requested by
3    counsel for the respective parties hereto.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

110

1            CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3              ) SS
4    COUNTY OF WAYNE   )
5
6            I, JOANNE SMITH, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20   *Joanne Smith*
21   _____
22   Joanne Smith, CSR-3099
23   Notary Public,
24   Wayne, Michigan.
25   My Commission expires: 1-24-23