UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANAS ELHADY,

        Plaintiff,

v.

                                Case No. 17-cv-12969

BLAKE BRADLEY, et al.,

                                HON. MARK A. GOLDSMITH

        Defendants.

_____/

**OPINION & ORDER**
**GRANTING MOTIONS FOR SUMMARY JUDGMENT FOR DEFENDANTS TONYA**
**LAPSLEY (Dkt. 99), DANIEL BECKHAM (Dkt. 100), JOSEPH PIRANEO (Dkt. 100),**
**AND JASON FERGUSON (Dkt. 101), AND DENYING SUMMARY JUDGMENT FOR**
**DEFENDANT BLAKE BRADLEY (Dkt. 101)**

Plaintiff Anas Elhady, an American citizen, claims that officers of United States Customs and Border Protection ("CBP") subjected him to unreasonably cold temperatures when they detained him as he attempted to re-enter the country after visiting Canada. Elhady has presented evidence that his core temperature dropped substantially while he was in custody for at least four hours, supporting the inference that he was detained under conditions violative of his due process rights under the Fifth Amendment. While Elhady has presented sufficient evidence that he suffered an unconstitutional deprivation, he has failed to show that the officers were deliberately indifferent to his health and safety, except as to Defendant Blake Bradley. Bradley indisputably spent significant time with Elhady during his detention and would have known about the cell's impermissible conditions if they in fact existed, supporting the inference that he was indifferent to Elhady's plight. Because of Bradley's personal involvement in the actionable conduct, the claim

1

against him may proceed to trial, but summary judgment is granted in favor of the other four remaining Defendants—Supervisory CBP Officer Tonya Lapsley, and CBP Officers Daniel Beckham, Joseph Piraneo, and Jason Ferguson. Elhady has not presented sufficient evidence of their involvement to show that they were deliberately indifferent to the conditions of his cell.[1]

## I.   BACKGROUND

Much of the timeline of Elhady's detainment is undisputed and corroborated by ambulance, hospital, and CBP records. The core factual dispute is whether the temperature in Elhady's cell was unreasonably cold. A review of the summary judgment record on the timeline and temperature follows.

### A.  The Timeline of Elhady's Confinement, Hospital Visit, and Release

#### 1.  Elhady's Seizure at the Ambassador Bridge

Anas Elhady is a United State citizen of Yemeni origin. Pl. Statement of Facts ¶ 1 ("PSOF") (Dkt. 112). Elhady travelled from Detroit, Michigan, to Canada on April 10, 2015, and attempted to return later that night. Id. ¶¶ 1-6; CBP TECS Query, Ex. 1 to Resp. at 2-3 ("TECS Query") (Dkt. 113-1).[2] After arriving at the Ambassador Bridge primary inspection booth around 1:43 a.m., CBP officers asked Elhady to exit the car, performed a pat-down search, and handcuffed him. PSOF ¶¶ 6-7; Elhady Dep., Ex. 11 to Resp., at 43-45 (Dkt. 114-1). Elhady claims that he

---

[1] By stipulation, four other defendants—Matthew Pew, Scott Rocky, Nyree Iverson, and Walter Kehr—have been dismissed (Dkt. 120).

[2] According to Defendants, "TECS, formerly known as the Treasury Enforcement Communications System, is a database used by the Department of Homeland Security to manage the flow of people through border ports of entry and for immigration case management. TECS is used by officers at the border to assist with screening and determinations regarding admissibility of arriving persons." Pew Statement of Material Facts ¶ 28 (Dkt. 96). The TECS Query contains the Secondary Inspection Report, CBP's primary narrative account of the encounter. TECS Query at 10-11.

was detained and interrogated solely because of his placement on the "federal terrorist watchlist." PSOF ¶ 18. Defendants have neither confirmed nor denied this allegation, and they assert that his status on the Terrorist Screening Database is "irrelevant for the purposes of this motion," Pew Statement of Material Facts ¶ 1 n.1 (Dkt. 96), a view with which the Court agrees.[3]

After Elhady exited his car, CBP officers escorted him to the secondary inspection building at the Ambassador Bridge, where he was placed in one of the facility's two detention cells at approximately 1:45 a.m. PSOF ¶¶ 19-22; Sosnowski Dep., Ex. 21 to Resp., at 69, 135 (Dkt 114-11).[4] The officers performed a search, and according to Elhady, the officers took Elhady's shoes, belt, watch, and jacket before removing his handcuffs and leaving him in the cell. Elhady Dep. at 48-58. Piraneo conducted the pat-down, which Beckham witnessed. TECS Query at 10. Elhady maintains that he was left in the cell wearing a shirt, pants, and some thin socks. PSOF ¶ 27. Elhady stated in his deposition that he was also wearing undershorts and an undershirt. Elhady Dep. at 54.

### 2. Elhady's Secondary Inspection and Detention

Elhady's secondary inspection lasted from approximately 2:00 a.m. to approximately 6:00 a.m. Sosnowski Dep. at 129. CBP records provide only a limited account of Elhady's whereabouts and activity during that timeframe. See Sosnowski Dep. at 79-86, 129-131.

---

[3] Defendants have incorporated one another's factual assertions in their motions and replies. See Notice of Joinder and Concurrence (Dkt. 102); Ferguson & Bradley Statement of Material Facts at 1 (Dkt. 101); Piraneo and Beckham Reply at 1 (Dkt. 118).

Each Statement of Material Facts and Reply to Counterstatement of Material Facts will be referred to using the respective Defendant or Defendants' name or names and the abbreviation "SMF" or "RCSMF."

[4] Nicholas Sosnowski was designated by CBP as its representative for a Rule 30(b)(6) deposition. He is a Supervisory CBP Officer. Rule 30(b)(6) Deposition by Written Questions, Ex. I to Ferguson & Bradley Mot. ¶ 2 (Dkt. 101-10).

CBP cannot locate the Personal Detention Log Sheets and the Master Detention Log Sheet. Id. at 26, 105. Therefore, CBP was unable to answer, or substantiate answers to, certain questions Elhady asked. For example, Sosnowski testified that he had information that Elhady was removed from his cell to be interviewed at some point during his detention. Id. at 76-77. However, that "information" was the fact that CBP has a practice of not conducting secondary inspections in detention cells. CBP lacks a record of adherence to that practice with respect to Elhady's secondary inspection, because the logs are missing. Id. Sosnowski testified that Bradley's interview of Elhady, which formed the basis of most of the information in the TECS Query, took place between approximately 2:00 a.m. and 6:00 a.m., but he could not provide a specific time. Id. at 129. The logs would also have contained records of whether officers followed the policy requiring an officer to check on a detainee every 15 minutes, and which officers performed those 15-minute checks. Id. at 61-62. Any officer on duty could have performed the 15-minute checks. Id. at 61.[5]

CBP produced some information about the detention, and some of the Defendants had partial recollections of the events. Lapsley was the supervisory CBP officer on duty the night of the detainment. See Lapsley Dep., Ex. 20 to Resp., at 16-21 (Dkt. 114-10). Lapsley initially assigned Ferguson and Bradley as case officers to interview Elhady and prepare a report. PSOF ¶ 32; TECS Query at 6. Ferguson said that he told Lapsley that he could not "do [the] case" because he was acting as the "lead-in" officer that night. Ferguson Dep., Ex. 13 to Resp., at 35-

---

[5] While the missing logs would undoubtedly have shed some light on the factual background of the case, Elhady has not filed any motion or made any explicit argument in his briefing asking the Court to draw any inference from the logs' unavailability, nor has he supplied pertinent authorities regarding that issue.

36 (Dkt. 114-3).[6]  According to Ferguson, Lapsley told Ferguson to continue doing lead-in and assigned the case to Bradley.  Id.

Bradley testified that he does not remember anything from the day Elhady was in CBP custody.  Bradley Dep., Ex. 16 to Resp., at 11 (Dkt. 114-6).  However, based on his review of the records, he said that he did not doubt that he was the case officer assigned to Elhady's case, meaning that he interviewed Elhady and wrote a report.  Id. at 11-12.  According to the CBP records, Bradley interviewed Elhady and wrote the Secondary Inspection Report, which he submitted at 9:52 EDT on April 11, 2015.  TECS Query at 10-11.  Other officers would have interacted with Elhady, either to perform the 15-minute checks or to escort him to an interview room, but only Bradley would have interviewed Elhady.  Sosnowski Dep. at 75.  Although Bradley denied interviewing Elhady in his cell, he does not appear to deny having interviewed Elhady.  Compare PSOF ¶ 37, with Lapsley RCSMF ¶ 37.

Elhady purports to remember the period of detention in more detail than the officers.  He testified that the cell was "really cold" from the moment he arrived.  Elhady Dep. at 57.  "It was colder than outside, colder than the waiting room, colder than the hallway.  It just—the more you walk into the cell, the colder it gets."  Id.  He could not determine whether the cell felt air conditioned, but he said that the cold in the room was "very noticeable."  Id. at 58.  Elhady testified that he did not complain about the temperature when he was first placed in the cell.  Id.

He described the cell as "really small."  Elhady Dep. at 54.  He said, "There's a door, a seat, metal seat connected to the floor and just big light throughout the whole—most of the ceiling. . . .  [I]f I would probably think of the measurement, I would say it was my height, length and—it

---

[6] Per Ferguson's description, a lead-in officer's primary responsibility is scheduling his fellow officer's assignments over the course of a shift.  Ferguson Dep. at 12.

was basically squared around my height."  Id. at 55-55; see also Detention Area Photos, Ex. 4 to

Resp. (Dkt. 113-4) (photographs of the Ambassador Bridge facility, including the detention cells).

Elhady described a series of interviews taking place in his cell following the pat-down.

When asked to confirm a statement from a previous deposition that four different people came to

question him in his cell over a period of time, Elhady stated, "[I]t was [a] bunch.  At this point, I

can't really recall if I said four.  Could be less or more.  I'm not sure, but it was more—I saw a lot

of faces."  Elhady Dep. at 61.

He said he first complained about the cold when the first officer to interview him came to

his cell:

> I told the officer that it's really cold in here.  How—I told them that I feel, you
> know, really shivering.  Can I get my shoes and jacket back at least if they, you
> know, finished searching those?  I mean I didn't think anything there to search
> about a light jacket or shoe, but I asked him to do that because the floor was the
> most, you know, freezing part.

Id. at 58.

Although Elhady could not remember the sequence of his interviewers, he described an

African-American man as one of the first two officers to interview him.  Elhady Dep. at 60-62, 71-

72.  He has since identified this individual as Bradley.  PSOF ¶ 37.  Other than Bradley, Elhady

has not identified any of the officers he claims interviewed him or interacted with him between the

time Piraneo and Beckham patted him down and the time he was released.  Other than stating that

the other officers who questioned him were white, the only identifying feature Elhady offered was

that one of the white officers had "kind of . . . chubby cheeks" and "was a little bit heavy weight."

Id. at 64-65.

Elhady stated that the first questioning session lasted between 30 minutes and an hour, and

that he complained about the cold and requested his shoes and jacket.  Id. at 68-70.  He then waited

45 minutes to an hour before the second interview.  Id. at 72.  He could not recall specifics of the

second interview, but he said, "Every time they were there . . . my three questions were, when I'm going to leave? Why am I here? And, can I get my [shoes and jacket]? And, of course, I mentioned it's really cold at all time[s]." Id. at 73.

He said that he remembered the third officer to come in and question him was a white male. Id. at 75. He did not remember how much time elapsed between the third and fourth interviews, or if four interview sessions even occurred. Id. But he said that the questions "seemed repetitive" and "there was a gap of 30 to 40 minutes, sometimes an hour between each questioning." Id. at 75. Concerning the cold, he said:

> [I]t was cold and it got colder and colder, and I felt like every part of the cell is colder than the other. And, I kept mentioning that, but they, they seemed to ignore the whole situation. Like they knew it was happening, they knew it was, you know, very cold and very bright light, but they did not even like try to feel the seat I was sitting on, to see how cold it is, nothing. There was just the distance between me and them, they're standing by the door and just questioning.

Id. at 77.

Elhady said that he requested a blanket. Id. at 78. Their refusal to provide one, along with the fact that the officers took his watch, jacket, belt, and shoes, contributed to his belief that the officers were intentionally subjecting him to harsh conditions. Id. at 78.

Elhady said that toward the end of the final interview, he was told he would be out shortly—something he said he had been told several times over the night. Id. at 79-80. He said he waited another 10 or 15 minutes, and then saw someone walking by the hall. "He was just walking by the hall, and I, I yelled to get his attention, that I'm freezing," Elhady said. Id. at 80.

He continued:

> I tried to get close to the bars without touching them because the door was cold, cold as well, to say, hello, I'm freezing, stuff like that. It's really cold. Can I please get help? I asked for help.
>
> And then I also—I don't know if it was the last interview or after I shouted out for help, a person came and I asked to go to the hospital because my body was shivering

out of my control.  I tried to even hold my hands to stay, you know, at least stay up until I leave, but he—I told him I needed an ambulance, and he told me, you'll be out soon.  Don't worry about it . . .

Id. at 80-81.  He continued:

And then I just kept—all I remember is me feeling really cold.  I was feeling like that ice is taking over my feet and the buzz in my head from the light is getting, you know, louder and louder.  And, it was weird because I can feel that my whole body is cold but the light is making the top of my head very hot which did not make sense to me.

But I was, I was just thinking.  I felt like I really was dying at that point because I was never put in a situation like this before.  And, I was just thinking, okay, they ignored me.  Now they're ignoring me more, and I've been here the longest period I ever, ever in my experience.  So after taking all that report, all the details, asking me everything in my head and put me in that situation, I felt like I was being—they were waiting for me to die.  And all I can think of is—was my mom, if she's really going to know how I died or they—it's just going to be a mystery to her.

Id. at 81-82.

He described being woken up by one or two officers, who started taking him seriously.  Id. at 82.  Elhady said that he did not know whether the person who ultimately helped him was the last interviewer or the person in the hallway.  Id. 81.  He requested an ambulance, because the buzzing in his head and the shaking from the cold prevented him from driving to the hospital himself.  Id. at 82-83.  The officers handcuffed him and moved him to a waiting room.  Id. at 83.  Elhady says that he was told he could leave at some point during the 15 to 30 minutes he spent in the waiting room, but that he insisted on being taken to the hospital.  Id. at 98-99.

The Secondary Inspection Report states that Elhady "complained of back pain, coldness and requested Emergency Medical Service to be called."  TECS Query at 11.  It does not state when or to whom Elhady complained.  Id.

The parties disagree about whether CBP agents interviewed Elhady in a detention cell or in another room.  Elhady claims CBP officers interrogated him in the "freezing cell rather than the video-recorded 'interview room' where such interrogations are supposed to occur," because

"Defendants decided to use the extreme cold of the detention cells that night to their advantage to ensure that their interrogation of Elhady was fruitful." Resp. at 27. Elhady notes that no video of any aspect of Elhady's detention has ever been identified or produced, PSOF ¶¶ 71-72, and that there are cameras in the interview rooms but not the detention cells, id.; Rocky Dep., Ex. 18 to Resp., at 33, 38 (Dkt. 114-8); Iverson Dep., Ex. 19 to Resp., at 52, 56 (Dkt. 114-9).

Bradley denies interviewing Elhady in a detention cell. Lapsley RCSMF ¶ 37. The denial appears to be based on Bradley's practice rather than a specific memory of the evening. In his deposition, Bradley stated that he has asked a detainee questions inside a holding cell, but that he has never conducted an "interview" inside a holding cell. Bradley Dep. at 204. CBP has also denied that its agents interviewed Elhady in the detention cell, based on its policies and regular practice. Sosnowski Dep. at 76-77.

### 3. Elhady's Ambulance Ride, Hospital Visit, and Departure

Some 15 to 30 minutes after Elhady was removed from the cell, an ambulance arrived, and Elhady says he was transported from the Ambassador Bridge waiting area to the ambulance. Elhady Dep. at 98-99. He said he could not remember what exactly he told the ambulance personnel, but he remembers how he felt:

> I was freezing. I was not feeling my body. My head was hurting. My back was hurting. My whole body was hurting. . . . [I]t was pretty painful. I don't see different between complain back pain and cold different than freezing, complaining from pain all over [sic].

Id.

He said that a CBP officer handcuffed him to the bed in the ambulance and that the "nurse" got really upset with the CBP officer.  Id. at 100-101.[7]  The ambulance record indicates that Elhady's chief complaint was of back pain, that he had a history of back pain, that he stated that he had been put in a "freezer" for four hours, that he had delayed capillary refill, and that he complained of being cold.  EMS Run Sheet at 2.  He was warmed and given oxygen.  Id.  Hellner, who testified to remembering the incident, said that delayed capillary refill was consistent with complaining of being cold.  Hellner Dep. at 44.  The ambulance arrived at the Detroit Receiving Hospital at 6:40 a.m.  EMS Run Sheet at 1.

Elhady presented for triage at 6:56 a.m.  Hospital Record, Ex. E to Pew Mot., at 9 (Dkt. 96-5).  A nurse took vital signs at 6:49 a.m.  Id. at 21.  Of note, Elhady's temperature was measured at 35.6 degrees Celsius, which the computer system flagged as below the 35.7-37.5-degree reference range.  Id. (Converted to Fahrenheit, Elhady's temperature was measured at 96.08 degrees, and the reference range was 96.26-99.5 degrees.).[8]

Elhady estimated that approximately an hour elapsed from the time he got out of the ambulance until a doctor saw him.  Elhady Dep. at 112.  The records indicate that he was evaluated at 7:48 a.m. by Dr. Scott Freeman and a resident, Dr. Michael Antoniolli.  Hosp. Record at 13.  The History of Present Illness states the following:

> This is a 21-year-old male who presents to the emergency department brought in by [border] control with complaints of lumbar back pain.  The patient states that he was picked up at customs but he does not know why.  He was placed in a 'freezer' on a hard wooden chair.  He states that his back began hurting from sitting on the uncomfortable chair.  He denies any trauma to the area.  He denies any recent falls

---

[7] The unit personnel were Jessica Hellner and Nicholas Jenuwine.  EMS Run Sheet, Ex. C to Pew Mot., at 2 (Dkt. 96-3).  Both were Emergency Medical Technicians.  Id.; Hellner Dep., Ex. D to Pew Mot., at 14 (Dkt. 96-4).

[8] The medical records and the medical professionals in this case generally use Celsius temperatures.  The Court has converted these to Fahrenheit for convenience.

or injuries. He states he had similar back pain several years ago that he treated with over-the-counter pain medications. He denies any medical problems. . . . He denies any numbness, tingling, or weakness. He has been ambulating without any deficit. He denies any saddle anesthesia, urinary retention, or loss of control his bladder or bowels.

Id. The record also notes:

He began having severe lower back pain. He denies any trauma. His examination is unremarkable. He was given Toradol 60 mg intramuscular. The patient will not give any information as far as to why he was picked up by police. He states that he does not know. He denies any injury to the area. Given his hesitance to give any information, I feel obtaining x-rays for any evidence of fracture at this time is appropriate. . . .

The patient's x-rays revealed no acute abnormality. Standard anticipatory guidance was given . . . The patient demonstrated understanding of these instructions and was discharged in satisfactory condition.

Id. at 14-15.

Elhady said that he initially spoke with the doctor while a CBP officer was still in the room, but that the doctor told the officer that he needed to leave the room. Elhady Dep. at 113. Afterward, he told the doctor his full story. Id. at 113-114. Elhady said that after he told his story to the doctor, the doctor gave him a blanket and Elhady fell asleep. Id. at 115.

After Elhady woke up and said that he was feeling "way better," the doctor told him he was "good to go." Id. At that point, Elhady said, the officers placed him in a wheelchair, handcuffed him, and brought him to a CBP van. Id. at 116.

Hospital records indicate that Elhady's vital signs were measured at 8:55 a.m. Hosp. Records at 28. An oral temperature reading indicated a temperature of 36.1 degrees Celsius (96.98 degrees Fahrenheit). Hosp. Record at 28. Id. He was released from the hospital and en route to the Ambassador Bridge at 9:10 a.m. TECS Query at 11.

Elhady said that when the van returned to the Ambassador Bridge, the handcuffs were removed, and Bradley returned Elhady's shoes, belt, jacket, and other belongings. Elhady Dep. at

122-123; PSOF ¶ 91.  Elhady was then released from CBP custody, Elhady Dep. at 123, and he drove away from the CBP building at 9:25 a.m., TECS Query at 11.

### B.  The Dispute as to the Cell Temperature and Elhady's Temperature

The parties offer a variety of evidence—some subjective, some circumstantial, some opinion-based—supporting their competing theories about whether CBP officers subjected Elhady to extreme temperatures during his detention.  Elhady supports his version of events with his memory; evidence of longstanding problems with the Ambassador Bridge's HVAC (heating, ventilation, and air conditioning) system; and an expert opinion purporting to deduce the temperature of Elhady's cell from the internal body temperature measured at the hospital and Elhady's self-described symptoms.  In addition to casting doubt on Elhady's evidence, Defendants offer their own memories; expert, agency, and personal opinions purporting to show that the conditions Elhady described could not have occurred; and medical records and testimony tending to show that Elhady did not experience exposure to severely cold temperatures.

### 1.  Elhady's Theory of the Temperature

Elhady's memory of the night is discussed at length above, and it should suffice to repeat that he felt the cell was "colder than outside, colder than the waiting room, colder than the hallway."  Elhady Dep. at 57.  According to a weather report Elhady submitted, the lowest temperature on April 11, 2015, was 36 degrees Fahrenheit.  April 2015 Weather Report, Ex. 7 to Resp. (Dkt. 113-7).  Defendants observe that the temperature did not drop to 36 degrees until sometime between 4:53 a.m. and 5:53 a.m., and that when Elhady was taken from his vehicle to the detention cell, the temperature was closer to 43 degrees.  Detroit Weather History of April 11, 2015, Ex. 1 to Lapsley Reply (Dkt. 117-1).

In addition to his own assessment of the temperature, Elhady presents evidence of "known and systemic temperature regulation problems at the Ambassador Bridge facility." Resp. at 13; PSOF ¶¶ 43-52. A history of HVAC problems at the Ambassador Bridge Facility is reflected in internal CBP emails, electronic correspondence between CBP officers and the Detroit International Bridge Company (which owns the Ambassador Bridge), and Sosnowski's testimony. See 2018 CBP Emails re: Maintenance Requests, Ex. 5 to Resp. (Dkt. 113-5) ("2018 HVAC Emails"); 2016 CBP Emails re: Thermostat, Ex. 6 to Resp. (Dkt. 113-6) ("2016 HVAC Emails"); Sosnowski Dep. at 153-205.

A 2018 email from Sosnowski addressed to the "Command Center" states the following:

Something is just not right with our HVAC system

- The thermostat in the lobby is set at 68 but it is 75 and the heat is still on.
- The side office, room 103, is not getting any heat
- The outside wall in one of the cells is 49
- The hallway, side office, and cells are very cold
- The thermostat in the hallway is set at 73 but the temperature reads as 60
- There is no hot air coming out of some of the vents in the hallway.

I apologize for continuing to report these problems, but the same issues are continuing to occur.

2018 HVAC Emails at 2.

Another February 2018 email indicates that a temperature was read at 58 degrees when the thermostat was set at 70 degrees. Id. at 3. Supervisory CBP Officer Jesse Winkel, the email's author, wrote that it "needs to be fixed so that we are within policy if someone gets placed in the detention cell." Id. Another email listed a measurement of 61 degrees in the cell and lower hallway, despite a thermostat being set to 70 degrees. Id. at 4. A March 2018 email states that the detention cells "are too hot to put someone in them." Id. at 5.

In an email exchange from December 2016, Supervisory CBP Officer Andrew Schultz expressed concern that the thermostat controlling the first floor for the hall and detention cells would "shut off on its own prior to the temperature reaching the stated [temperature] on the thermostat," presenting "an issue that needs to be address [sic] as the temperature in our detention cells needs to be within a particular temperature range (66-80) for people to be detained in them." 2016 Emails at 3. Sosnowski testified to his belief that CBP complained about the temperature to the Detroit International Bridge Company in 2015. Sosnowski Dep. at 153-154.

According to Sosnowski, CBP adopted a policy in October 2015 that the detention cells be kept "at a reasonable and comfortable temperature." Sosnowski Dep. at 171-172. No such policy existed in April 2015. Id. Sosnowski Dep. at 171-172. No policy required officers to check the temperature of a cell prior to placing a detainee in a cell. Id.

Finally, Elhady has obtained and submitted the expert report of Dr. Gordon Giesbrecht. Expert Report of Dr. Gordon Giesbrecht, Ex. 10 to Resp. (Dkt. 113-10) ("Giesbrecht Report"). Giesbrecht has a Ph.D. in respiratory physiology and is a Professor of Thermophysiology at the University of Manitoba. Id. at 2. Based on his review of the record, Dr. Giesbrecht concluded that the "cell would have been very cold to be consistent with subjective and objective evidence." Id. at 7. Giesbrecht worked backward from Elhady's symptoms and his temperature, measured at 35.6 degrees Celsius (96.08 degrees Fahrenheit) at the hospital. Id. Giesbrecht wrote that a 35.6-degree temperature indicates a core temperature drop of at least one degree Celsius from normal. Id. Giesbrecht input the patient and environmental information to the "Cold Exposure Survival Model," which he says has been validated and published in peer-reviewed literature. Id. at 5 (including citations). Based on the estimates produced by the model, Giesbrecht offered the following analysis:

> [I]t would not be possible to cause a decrease in core temperature of 1°C if the cell temperature matched outside conditions 2.2°C.[9]   It is likely that the cell temperature would have had to been even colder (as reported by Mr. Elhady) and possibly below freezing for this decrease in core temperature to occur within 4.5 hours.

Id. at 7.[10]   According to Dr. Giesbrecht, 35.6 degrees falls within the range (35-37°C, or 95.0°-98.6°F) at which a person is "[c]old stressed but not clinically hypothermic."   Id. at 4.   At these temperatures, he writes that a "[v]ictim is fully conscious, can sense cold and discomfort (except in frostbitten areas it [sic] they exist), and increases shivering intensity to vigorous levels as core temperature decreases within this range; this is very uncomfortable."   Id.

### 2.  Defendants' Theory of the Temperature

Defendants contend that it is impossible to use the HVAC system to achieve the temperature Elhady described.   According to Sosnowski, the thermostat controlling the first floor of the Ambassador Bridge cannot cool the zone including the cell area to a temperature lower than 50 degrees.   Rule 30(b)(6) Deposition by Written Questions, Ex. I to Ferguson & Bradley Mot., ¶¶ 61-73 (Dkt. 101-10).   Defendants also hired an HVAC expert, Dennis Mando of Denny's Heating, Cooling & Refrigeration.   See Expert Report of Dennis Mando, Ex. 1 to Ferguson & Bradley Reply (Dkt. 119-1) ("Mando Report").   Based on his general knowledge of HVAC systems and his familiarity with the units at the Ambassador Bridge facility, Mando stated the following:

> [I]t is physically impossible to use the thermostat unit that regulates the ground-floor detention cells to decrease the temperature of only the detention cells without also decreasing the temperature of other areas regulated by the same thermostat

---

[9] This translates to approximately 36 degrees Fahrenheit, the overnight low.

[10] Giesbrecht assumed that Elhady was in his cell without his jacket and shoes from 1:47 a.m. until 6:20 a.m.   Giesbrecht Rep. at 5-7.   Giesbrecht's timeline is roughly consistent with CBP's estimates, except that CBP denies that Elhady was continuously in his cell.   See Sosnowski Dep. at 69-84.

unit, including the first and second floor hallways and the offices on the first and second floor.

Technically speaking, the thermostat unit that regulates the ground-floor detention cells can be set as low as between 45 and 50 degrees Fahrenheit. The thermostat unit cannot be set below 45 degrees and cannot be used to cool that area below 45 degrees.

Practically speaking, if the thermostat unit that regulates the ground-floor detention cells were set to 45 degrees, the unit would more likely than not freeze up when the temperature of the building reached somewhere around 60 degrees, give or take a few degrees depending upon the humidity level inside the building at the same time.

. . .

In sum, although the thermostat unit can be set as low as 45 to 50 degrees, it is highly unlikely that the Bryant unit could accomplish this without causing the unit to malfunction long before the temperature of the building reached that level.

Id. at 1-2.

Based on Sosnowski and Mando's testimony, Defendants conclude that neither they nor anyone else could intentionally use the HVAC system to reduce the temperature to the temperature Elhady describes. Ferguson & Bradley Reply at 3-4. They further note that "there is no evidence of any malfunctions ever that resulted in dangerously cold cell temperatures (and zero evidence of a malfunction on April 11, 2015)." Id. at 4 (emphasis in original).

Concerning the Giesbrecht Report, Defendants argue that it is insufficiently explained and should be ignored. Id. at 5. Concerning Elhady's delayed capillary refill, Defendants cite a statement by Elhady's ER physician, Dr. Antoniolli, who agreed that the delayed capillary refill was consistent with cold but inconsistent with life-threatening hypothermia. Antoniolli Dep., Ex. K to Ferguson & Bradley Mot., at 88-90 (Dkt. 101-12).

Defendants also note that Elhady was treated for back pain at the hospital, not any condition related to exposure. See, e.g., Pew SMF ¶ 22. They also cite testimony from Ariana Zani, a registered nurse who treated Elhady at the hospital, who stated that Elhady's temperature was taken orally, that oral temperatures are less accurate than rectal temperatures, and that rectal

temperatures tend to show temperatures about a degree higher than oral temperature readings. Zani Dep., Ex. G to Pew Mot., at 38, 91-92 (Dkt. 96-7). Dr. Antoniolli agreed. Antoniolli Dep. at 38-39.

Defendants do not dispute that "Elhady may have felt cold," but they rely significantly on "[t]he fact . . . that <u>none</u> of the medical professionals with whom Elhady interacted that day suspected or treated Elhady for hypothermia even though he informed them that he was put in a 'freezer.'" Ferguson & Bradley Mot. at 20 n.6 (emphasis in original).

Defendants also offer a report from Robert A. Mulliken, M.D. <u>See</u> Expert Report of Robert A. Mulliken, M.D., Ex. 1 to Piraneo & Beckham Reply (Dkt. 118-1) ("Mulliken Report"). He writes that neither of Elhady's temperature readings, 35.6 and 36.1 degrees, is hypothermic. <u>Id.</u> at 3-4.

## II.  STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing

a triable issue of material fact.  Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## III.    ANALYSIS

As discussed in the opinion denying Defendants' motion to dismiss, "Elhady brings a Fifth Amendment claim, as that amendment's Due Process Clause prohibits the government from imposing torture or cruel and unusual confinement conditions on non-convicted detainees." Elhady v. Pew, 370 F. Supp. 3d 757, 764 (E.D. Mich. 2019).  In that opinion, the Court also stated that such a claim has two elements—a sufficiently serious deprivation, and the defendant-official acting with deliberate indifference to the inmate's health and safety.  Id.  These standards, borrowed from the Eighth Amendment case law, are sometimes called the "objective" and "subjective" elements, respectively.  The Sixth Circuit describes these two elements as follows:

> An Eighth Amendment conditions-of-confinement claim has two elements.  First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities.  Second, the prison official's state of mind [must be] one of deliberate indifference to inmate health or safety.

Spencer v. Bouchard, 449 F.3d 721, 728 (6th Cir. 2006) (internal citations and quotation marks omitted), abrogated on other grounds by Jones v. Bock, 549 U.S. 199 (2007).

The parties disagree as to whether the facts, viewed in the light most favorable to Elhady, could support a finding for Elhady on the objective elements; whether Elhady must prove the

subjective element; whether Defendants are protected by qualified immunity; and whether either party violated the local rules in the briefing.[11]

### A. The Objective Element

On the objective element, the parties agree that Elhady must show that the deprivation alleged is sufficiently serious that it resulted in the denial of the minimal civilized measure of life's necessities.  Spencer, 449 F.3d at 728.  This Court's approach to this element is the same as it was in its previous order denying Defendants' motion to dismiss:

> The court's opinion in [Burley v. Miller, 241 F. Supp. 3d 828 (E.D. Mich. 2017)] provides a good template for consideration of cold-condition cases.  In that case, the court observed that although the 'Supreme Court has held that prison conditions may be uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment,' the Eighth Amendment does impose 'duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.'  Burley, 241 F.Supp.3d at 836 (internal citations omitted) (alteration in original).  Courts are to consider '[t]he circumstances, nature, and duration of a deprivation' in evaluating these claims.  Id. (internal citations omitted) (alteration in original).  'Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have

---

[11] This last issue requires little discussion.  Elhady argues that Defendants violated the local rules by incorporating portions of each other's briefs into their own briefs, effectively giving each Defendant more than the twenty-five pages allowed by Local Rule 7.1, and making it very difficult to respond to all facts alleged.  Resp. at 47.  In turn, Defendants observe that Elhady violated the scheduling order by failing to include a counterstatement of material facts.  Finally, although Elhady has not raised it, Defendants again cross-incorporated each other's fact sections in their reply briefs, arguably rendering their briefs longer than the ten pages specially allowed.

When page limits are inadequate for a party's needs, the party should request a page-limit extension rather than omitting a section required by the scheduling order or writing briefs that arguably exceed the page limit.  Ironically, each party has requested a page-limit extension with regard to briefing a portion of these motions, and each opposing party has been gracious enough to stipulate to an order granting the other party's request.  The parties should be more transparent about their briefing needs in future filings, and they must comply with the scheduling order.

In the interest of promptly resolving the issues raised and in the absence of any demonstrated prejudice, the Court declines to strike any portion of the briefing.

a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.' Id. (internal quotation marks omitted) (emphasis in original). The court went on to analyze a number of cases, ultimately drawing the conclusion that there exists a 'right to be free from exposure to severe weather and temperatures.' Id. at 839. Notably, the court cited a Seventh Circuit case finding that frostbite, hypothermia, or a similar infliction is not an 'absolute requirement to the inmate's challenge' in a cold-conditions case. See Del Raine v. Williford, 32 F.3d 1024, 1035 (7th Cir. 1994).

Elhady, 370 F. Supp. 3d at 764-765.

The paucity of Fifth Amendment cold conditions cases has led Elhady to draw on the relatively abundant Eighth Amendment caselaw. See Resp. at 30-31. Due process entitles pretrial detainees to rights "at least as great as the Eighth Amendment protections available to a convicted prisoner." Scozzari v. Miedzianowski, 597 F. App'x 845, 848 (6th Cir. 2015). Therefore, conditions found to violate prisoners' Eighth Amendment rights would, presumptively, violate detainees' Fifth Amendment rights.

Elhady cites cases in which courts have found that exposure for several hours to freezing or near-freezing temperatures violates a prisoner's or detainee's right to be free from exposure to severe weather and temperatures. See Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980) (alleging the plaintiff was placed in an isolation cell that reached near-freezing temperatures at night); Smith v. Allbaugh, 16-cv-654, 2018 WL 4402968, at *8 (W.D. Okla. Apr. 30, 2018) (alleging that the plaintiff was placed in an outdoor pen for five hours in freezing or near-freezing temperatures without proper clothing); see also Burley, 241 F. Supp. 3d at 838-839 (alleging that prison officials forced the plaintiff to stand in freezing rain for 10 to 12 minutes and then to remain in his saturated clothing for another two hours).

As explained below, Elhady has presented enough evidence that a reasonable jury could find that he was placed in a cell at freezing or near-freezing temperatures for at least four hours,

and that such treatment constitutes a violation of his right to be free from exposure to severe weather and temperatures.

The parties' testimony provides two versions of the events in question, and the jury must decide which to believe. Taken together, Elhady's temperature reading at the hospital and the Giesbrecht Report could provide a jury with a sufficient, objective basis to credit Elhady's description of his experience. Defendants have already attacked the validity of an oral temperature reading and have attacked Giesbrecht's methodology. See Ferguson & Bradley Reply at 5. They are free to challenge the report's conclusions and to argue that the jury should not credit it, but it would be premature to exclude it at this stage. Contrary to Ferguson and Bradley's assertions, Giesbrecht has done more than provide a conclusory assertion about ultimate legal issues. See id. He has provided his qualifications and a basic, step-by-step account of how the temperature in the cell could be deduced from Elhady's temperature reading at the hospital and his alleged symptoms. He has also provided references to scholarly materials that detail his methodology. Giesbrecht Report at 5.

Defendants' expert, Dr. Mulliken, notes "significant factual disputes" between Elhady's report and the recollection of EMT Hellner. Mulliken Rep. at 2. Significant factual disputes are precisely what render issues unsuitable for summary judgment. Furthermore, he rebuts Professor Giesbrecht's opinion on the cell's temperature by writing that Giesbrecht "uses Mr. Elhady's testimony to extrapolate backward and model a cell temperature. But this approach to modeling is only accurate if the testimony is accurate." Id. at 3. However, Dr. Mulliken appears to overlook that the most significant input in Giesbrecht's model is Elhady's temperature reading of 35.6 degrees Celsius, and he does not dispute the method by which Giesbrecht converts inputs (Elhady's temperature, Elhady's self-described symptoms) into outputs (the cell's temperature). Id. ("While

21

the professor's model may be accurate for someone who suffered the symptoms Mr. Elhady described, there is not medical evidence that Mr. Elhady should have suffered such symptoms outside of Mr. Elhady's own statements").

Defendants also argue that Elhady has failed to put forward a plausible theory for how the cell became so much colder than the rest of the building. Ferguson & Bradley Reply at 3-4. Certainly, the Mando Report and Sosnowkski's testimony cast significant doubt on the ability of the HVAC system to chill the room to the temperature Elhady has described. However, the mere fact that the HVAC system, properly functioning, could not be used to lower the cell's temperature to the temperature Elhady described does not mean that the cell could not have been that cold. Between the cold outdoor temperature and the history of a malfunctioning HVAC system, Elhady has sufficient material to assert a plausible theory. Furthermore, Elhady can succeed on his claim that he was exposed to extreme temperatures without proving the precise mechanism by which those temperatures were achieved. These are all questions of fact, and Elhady has produced enough evidence to defeat summary judgment on this issue.

Defendants argue that even if Elhady can prove his alleged facts, he has not made out a sufficient case on the objective prong. They raise numerous cases to make this point, none of which is persuasive.

Initially, Ferguson and Bradley raise numerous cases in which plaintiffs lost their claims despite alleging deprivations arguably more serious than the most severe deprivation Elhady can prove. However, these cases are distinguishable. They do not contradict the finding that Elhady's claims are sufficiently serious to meet the objective prong of the Fifth Amendment test.

As Defendants argue, the magistrate judge's report and recommendation approved by Harris v. Hulkoff, 05-cv-198, 2007 WL 2479467, at *4 (W.D. Mich. Aug 28, 2007), holds that

subjective feelings of cold are insufficient to state an Eighth Amendment claim.  But the plaintiff in that case failed to provide any objective evidence of the temperature.  Id.  Contrary to Ferguson and Bradley's claim that Elhady "subjectively felt cold but offered no objective evidence as to the cell temperature," see Ferguson & Bradley Mot. at 12, Elhady offers neutral, objective evidence of his body temperature when he reached the hospital, from which his expert deduced the temperature in the cell.  This evidence is disputed, but it is objective, thereby distinguishing Harris.  Likewise, in Palmer v. Abdalla, 11-cv-503, 2012 WL 4473206, at *5 (S.D. Ohio Sept. 4, 2012), the plaintiff failed to offer objective proof of the temperature in his cell.  Again, Elhady has offered objective evidence.

In Trevino v. Jones, No. 06-cv-0257, 2007 WL 710213, at *6-7 (N.D. Okla. Mar. 6, 2007), the court denied the Eighth Amendment claim, leaning on the "exigencies of running a prison," and the "restrictive and even harsh" conditions officers may impose on prisoners without violating the Eighth Amendment.  Nothing comparable excuses the allegedly harsh conditions in this case.  The Due Process Clause forbids punishment of non-convicted detainees, Bell v. Wolfish, 441 U.S. 520, 535 (1979), and Defendants have offered no legitimate, nonpunitive reasons for exposing Elhady to allegedly unreasonably cold conditions.  Furthermore, the court in Trevino found that the prisoners forced to spend time outside were given coveralls, meaning the plaintiff was "not subject to low temperatures without any protection."  Id. at *7.  Elhady raises a genuine question as to whether the clothing Defendants allowed him to keep was sufficiently warm.

The medical evidence in LaPine v. Caruso, No. 09-cv-214, 2011 WL 1004603, at *6 (W.D. Mich. Mar. 18, 2011), provided "absolutely no indication" that the plaintiff in that case was "subjected to freezing temperatures in his segregation cell."  Again, Elhady's oral temperature reading and expert report distinguish this case.

23

Likewise, in Van Williams v. Cook Cty., Georgia, 03-cv-120, 2006 WL 2444065, at *6 (M.D. Ga. Aug. 22, 2006), the plaintiff failed to establish a sufficiently cold temperature. Ferguson and Bradley argue that even crediting Elhady's testimony, the conditions were no worse than those alleged by Van Williams. However, the plaintiff's allegations were not the decisive factor in Van Williams. The plaintiff alleged that open and broken windows, and the absence of heat, left him exposed to overnight temperatures in the 30s. Id. at *5-6. But the court assumed that "some form of heating system" was operating and reaching the plaintiff's cell. Id. at *6. The case does not provide guidance on whether exposure to temperatures in the 30s would constitute a constitutional violation.

In Washington v. Burks, No. 04-cv-10352, 2008 WL 8694601, at *10-11 (E.D. Mich. Dec. 17, 2008), the plaintiff failed to allege any harm greater than discomfort. Furthermore, Washington appears to rely on the Eighth Amendment's permissiveness of a degree of discomfort that may exceed what the Fifth Amendment allows. Id.

Next, Defendants cite a range of cases supposedly supporting the proposition that short periods of exposure are not objectively serious enough to violate the Eighth Amendment. See Ferguson & Bradley Mot. at 15-17; see also Resp. at 34-38. In all of these cases (with one exception), the plaintiffs failed to make sufficient allegations or offer sufficient proof of being exposed to freezing or near-freezing temperatures without sufficient clothing.

The one exception is the most extreme case Defendants cite. See Mena v. City of New York, 12-civ-0028, 2014 WL 2968513, at *9 (S.D.N.Y. June 27, 2014). For the sake of the summary judgment motion, the court assumed that a prisoner had been exposed to a temperature of 37 degrees for an entire day. Id. Mena held that such a deprivation would not be actionable under the Eighth Amendment: "Courts require exposure to below freezing temperatures for at least

24

weeks at a time to prevail on an Eighth Amendment Claim." Id. This is a severe overstatement of the Second Circuit's Eighth Amendment law, which does not draw any such bright line. In any case, it is inconsistent with the caselaw within our Circuit, which this Court chooses to follow. Burley, 241 F. Supp. 3d at 848 (even brief periods of exposure to cold can violate prisoner rights, especially without any purported justification).

Elhady has alleged, and offered proof of, a sufficiently serious deprivation such that summary judgment cannot be granted for Defendants on the objective prong.

### B. The Subjective Element

The parties dispute whether Elhady must prove a "subjective element" to his claim—that is, a defendant's deliberate indifference to the health and safety of a plaintiff. This Court holds that he must. Furthermore, he must demonstrate each Defendant's deliberate indifference by establishing that officer's personal involvement in the actionable conduct. Elhady has raised a genuine question as to whether Bradley was deliberately indifferent to Elhady's unconstitutional conditions of confinement; however, he has failed to do so with respect to the other Defendants.

### 1. The Need to Prove the Subjective Element

Defendants argue that Elhady has failed to prove the subjective prong, while Elhady argues that the Fifth Amendment contains only an objective prong. Resp. at 26-27. Elhady points to Kingsley v. Hendrickson, — U.S. —, 135 S. Ct. 2466 (2015), which held that in an excessive force case brought under the Fourteenth Amendment's due process clause, a detainee need only show that an officer's use of force was objectively unreasonable—not that the officer was subjectively aware that his use of force was excessive.

However, Kingsley did not purport to go beyond the excessive force context. And Elhady does not explain how a decision in the context of excessive force should apply in a case based on unconstitutional conditions of confinement. Nor does he explain why a case rejecting the need to

prove a government actor's knowledge that the force he employed violated a legal norm would mandate rejecting the need to show that a government actor was aware that a detainee's health or safety was seriously at risk.  An unexplained argument cannot require a court to search for and establish the argument's validity.  See, e.g., United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs").

The need to show the government actor's deliberate indifference to the health or safety of someone under his charge or care has long been the staple of constitutional torts.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976) (establishing the deliberate indifference standard in the context of failure to provide adequate medical care).  Indeed, the very cases Elhady cites confirm this longstanding principle.  See Resp. at 26-27 (citing Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); Spencer v. Bouchard, 449 F.3d 721, 726-728 (6th Cir. 2006)).  The need to establish that subjective element remains the law of this Circuit.  See, e.g., Cooper v. Montgomery Cty., Ohio Sheriff's Dept., 768 F. App'x. 385, 392 (6th Cir. 2019) (applying subjective element after issuance of Kingsley, with no discussion of Kingsley).  So long as that remains true, this Court is not free to jettison this element for a Bivens claim alleging unconstitutional conditions.[12]

---

[12] The Court is not unaware of the current debate among the circuits on how Kingsley might apply outside the excessive force context.  Numerous courts have held that in cases governed by the deliberate indifference standard, plaintiffs can prove deliberate indifference by showing that the defendant-official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health and safety."  Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (applying this principle in a conditions-of-confinement case); accord Miranda v. Cty. of Lake, 900 F.3d 335 (7th Cir. 2018) (failure to treat); Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) (failure to protect).  But none of these cases adopts anything like the proposition Elhady claims is the law—that he need only prove that a prison official's act or omission resulted in the denial of the minimal civilized measures of life's necessities.  See Resp. at 27.  These cases allow plaintiffs to prove the subjective prong using objective evidence; they do not do away with the subjective prong entirely.  See Darnell, 849 F.3d at 35; see also Castro, 833 F.3d at 1071 (holding that plaintiffs must prove "more than negligence but less than subjective intent—something akin to reckless disregard.")  For cases declining to

Nonetheless, Elhady's claim as to one Defendant is saved from summary judgment by the fact that under longstanding Sixth Circuit and Supreme Court precedent, Elhady has created a factual issue for trial as to the subjective element.  As Defendants have conceded, "[t]he Court 'may infer the existence of [a] subjective state of mind from the fact that the risk of harm is obvious.'"  Ferguson & Bradley Mot. at 21 (quoting Hope v. Pelzer, 536 U.S. 730, 738 (2002)); see also Spencer, 449 F.3d at 729 (describing a case involving cold, wet conditions as the "perfect candidate for imputing knowledge based on the obviousness of the risk").  Under that principle and evidence presented, Spencer found that two jail officers were deliberately indifferent to cold and wet conditions when those officers were seen wearing winter coats indoors and when they personally received complaints from prisoners.  449 F.3d at 729.

Therefore, the Court similarly infers that any officer who (a) had contact with the cell or heard Elhady's complaints, and (b) knew that Elhady would spend a substantial period of time in the cell, knew that the cell's conditions imposed an excessive risk to Elhady.  As discussed below, Bradley is the only Defendant who meets that description.

 Defendants do not cogently address any of the evidence supporting deliberate indifference, except to argue that Elhady did not sufficiently complain about the cold temperature.  Ferguson & Bradley Reply at 2.  However, Elhady's evidence confirms that there is a genuine issue of fact whether Bradley was deliberately indifferent.

---

apply Kingsley outside the excessive force context, see Whitney v. City of St. Louis, Mo., 887 F.3d 857, 860 n.4 (8th Cir. 2018); Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); Alderson v. Concordia Par. Corr. Facility, 848 F.3d 415, 420 n.4 (5th Cir. 2017). The Sixth Circuit noted this circuit split in a case addressing claims of deliberate indifference to medical needs, but it declined to adopt any view on the impact of Kingsley because the issue had not been briefed.  See Richmond v. Huq, 885 F.3d 928, 937-938, 938 n.3 (6th Cir. 2018).

### 2.  Individualized Analysis

The plaintiff in a <u>Bivens</u> action must prove that each individual defendant "was personally involved in the deprivation of the plaintiff's constitutional rights."  <u>See</u> <u>Mueller v. Gallina</u>, 137 F. App'x 847, 850 (6th Cir. 2005).  Vicarious liability is not a basis for liability, and each government official "is only liable for his or her own misconduct."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009). Questions of individual defendants' involvement often present themselves in the context of analyzing the subjective element of a <u>Bivens</u> or § 1983 question.  <u>See</u> <u>Stoudemire v. Mich. Dept. of Corr.</u>, 705 F.3d 560, 570 (6th Cir.  2013) ("[T]he question of whether an official possessed the requisite knowledge and culpable mental state to sustain a deliberate indifference claim must be addressed for each officer individually.").  Therefore, the Court turns its attention to the question of whether each individual Defendant "had the personal involvement necessary to permit a finding of subjective knowledge."  <u>See</u> <u>Bishop v. Hackel</u>, 636 F.3d 757, 768 (6th Cir. 2011).

<u>Burley</u> and <u>Spencer</u> offer at least three examples of officers whose actions with respect to a prisoner or detainee support an inference of deliberate indifference:

- A defendant who physically forces or verbally orders a detainee to remain in extreme weather conditions, <u>Burley</u>, 241 F. Supp. 3d at 838-839;

- A supervisor who authorizes, approves, or knowingly acquiesces in a subordinate's decision to expose a detainee to extreme weather conditions, <u>id.</u>; <u>see also</u> <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999) (describing the knowing acquiescence standard);

- An officer who fails to act upon knowledge that a detainee was being exposed to extreme weather conditions for an excessive period of time, <u>see</u> <u>Spencer</u>, 449 F. 3d at 729-731.

Under these established theories of personal involvement, Elhady has provided  evidence of Bradley's personal involvement reflecting deliberate indifference sufficient to defeat summary judgment.  However, he has not provided sufficient evidence of any other Defendant's personal involvement, so their motions for summary judgment must be granted.

### a. Blake Bradley

Bradley was the case officer assigned to Elhady's case, and he does not dispute having questioned Elhady.  Bradley Dep. at 12, 239.  Elhady says that at each interview he complained of the cold.  Elhady Dep. at 71, 73.  He also maintains that each interview took place in the cell.  Id. Therefore, if the facts were as Elhady says they were, a jury could reasonably draw the inference that Bradley knew that the cell was unbearably cold and nonetheless disregarded Elhady's complaints.

While Bradley could not identify the time when his involvement began or ended, a jury could infer that Bradley knew the approximate amount of time Elhady would spend in his cell, because he was the case officer assigned to Elhady.  See Sosnowski Dep. at 74 (explaining that Bradley conducted the secondary inspection).  Bradley attempts to evade responsibility for any deprivation that occurred before he first interacted with Elhady, trying to shorten the duration of Elhady's confinement for which he may be culpable from somewhere between four and four-and-a-half hours to three hours and seventeen minutes.  See Ferguson & Bradly Mot. at 21-22; Ferguson & Bradley Reply at 7-8.  Shaving the time period during which he was aware of the cell conditions would not be material, as a three-hour and seventeen-minute period of deprivation would still be a serious one.

In any case, a jury could reasonably reject this effort to narrow the timeframe, based on Bradley's role as case officer and information available to him in the detention logs.  It could conclude that he knew how long Elhady had been confined before he and Elhady first interacted. See Sosnowski Dep. at 47-61 (describing the availability of this information in the detention logs). If Bradley learned when Elhady's harsh conditions began and continued the deprivation for two or three more hours, he may be held responsible for the cumulative effect.  Cf. Burley, 241 F. Supp.

3d at 839 (finding that an officer who endorsed his fellow officers' order that a prisoner stand outside in the freezing rain could be found liable).

Among all the Defendants, only Bradley has failed to argue that Elhady cannot connect him personally to the alleged deprivation.  See Ferguson & Bradley Mot. at 24 (arguing that Ferguson was not personally involved); Ferguson & Bradley Reply at 13 (same).  He was simply too involved in Elhady's confinement to argue otherwise.

Summary judgment cannot be granted to Bradley.

### b.  Piraneo and Beckham

Piraneo performed a pat-down of Elhady in the detention cell, which Beckham witnessed. TECS Query at 10.  Elhady testified that the cell was "really cold" from the moment he arrived. Elhady Dep. 57.  He also testified that he did not immediately complain about the temperature when Piraneo and Beckham placed him in it.  Elhady Dep. at 58.

Elhady's theory of the case relies on both the cell's temperature and the amount of time he spent in the cell.  Even assuming Piraneo and Beckham were aware that the cell's temperature was at or near freezing, Elhady has not presented evidence that Beckham and Piraneo were aware of how long Elhady would remain in the cell, that their co-workers would violate policy or practice by conducting an interview inside the cell and ignoring his requests for additional clothing or blankets, or that his interview would last as long as it did.

Beckham and Piraneo performed a role in Elhady's detainment, but a constitutional violation was not complete when their confirmed involvement in his detainment ended. Furthermore, Elhady has not offered proof suggesting that they knew he would be left there as long as he claims he was left there.  Therefore, finding them culpable would require speculation

as to matters for which no evidence has been presented.  A jury could not reasonably find them to have been deliberately indifferent to Elhady's suffering.

### c.   Ferguson and Lapsley

Elhady has not alleged that he had direct contact with Ferguson or Lapsley, or that either of them was ever present in his cell.  See Resp. at 43-44; see generally PSOF.  Therefore, they cannot be said to have "ignored or dismissed Elhady's complaints about the cold."  See Resp. at 42.

Elhady makes no specific claim that Lapsley had contact with Elhady or the cell, or that she otherwise knew of the conditions in his cell.  Resp. at 43-44.  Elhady only offers the conclusory statement that she "either knew or should have known that the detention cell was extremely cold."  Resp. at 43.  This is insufficient to support an inference that Lapsley actually knew of the cell's temperature, which would be necessary to support liability under Burley or Spencer.[13]

Elhady offers a slightly more detailed theory for how Ferguson might have learned of the temperature in the cell, based on Ferguson's role as "lead-in" officer.  Resp. at 44.  But it is too speculative to say, "[a]s the lead-in officer down the hall, Ferguson should have heard and responded to Elhady's pleas for help, but instead Elhady was ignored."  Resp. at 44.  Although Ferguson testified that he would have heard Elhady from his position in the lobby if Elhady had been pounding on the door or screaming, Ferguson Dep. at 180-181, Elhady's testimony does not establish that he yelled persistently enough to support the inference that Ferguson actually heard and ignored him.  Reviewing the portions of Elhady's deposition cited in PSOF ¶ 61, it appears

---

[13] Elhady similarly attempts to establish every other Defendant's liability based on the allegation that he "knew or should have known" the cell's temperature.  See Resp. at 42-44.  Conceivably, this theory of liability might be viable if the Court applied the interpretation of Kingsley offered in cases like Castro, 833 F.3d 1060.  See supra note 12.  However, the Court will not consider the implications of an argument Elhady failed to make explicitly.

that Elhady only began yelling for help after the final interview, and that the next thing he remembered was being revived and removed from his cell. See Elhady Dep. at 80-82. Elhady did not remember the circumstances from the time he yelled for help until he was revived with sufficient clarity to support an inference that anyone heard him and failed to respond appropriately. Id. Furthermore, he has not specifically identified any Defendant who heard and ignored him. Id. at 163.

In sum, Elhady has not presented evidence that Ferguson or Lapsley had direct contact with Elhady or the cell, or that they otherwise knew of the conditions of his cell. Thus, he has failed to show they were deliberately indifferent to Elhady's cell conditions.

### 3. Alternative Theories of Liability

In addition to attempting to demonstrate Defendants' personal involvement by proving that they actually knew of the cell's conditions, Elhady attempts to establish individual liability from evidence indicating "that all Defendants were responsible to maintain Elhady's conditions of confinement." Resp. at 42. He argues that "all [he] needs to show is that 'by nature of their positions' and the requirements of the Constitution, each Defendant had a duty to protect Elhady from unconstitutional conditions." Id. at 45 (quoting Jackson Lockdown, 568 F. Supp. 869, 878 (E.D. Mich. 1983)).[14]

---

[14] Jackson Lockdown is not the silver bullet Elhady imagines it to be. See Resp. at 42, 45-46. In that case, the plaintiffs sued prison officials who allegedly had prior knowledge of a likely prison riot and failed to take necessary precautions, resulting in injuries and subsequent deprivations of basic needs. 568 F. Supp. 869, 873-875. In denying the motion to dismiss, the court found as sufficient allegations of personal involvement that the officials had awareness of the planned riots and, by the "nature of their positions," were undoubtedly involved in the decisions to impose the post-riot conditions. Id. at 878. By contrast, in our summary judgment context, Elhady has not offered proof that every officer would have known the temperature of Elhady's detention cell, that Lapsley would have known every detail of a "case" she assigned to a subordinate officer, or that every Defendant would have heard Elhady's requests for help. The Court cannot fill in the gaps in this case, or ask the jury to do so, through speculation.

But proving a duty is not enough.  If it were, anyone in some sense "responsible" for a detainee's confinement would be liable for any harm that befell the detainee while in their custody. Such a rule would impose liability against the officer whose mere negligence resulted in harm to her charge and could easily evolve into a strict liability form of jurisprudence.  In his discussion of Defendants' responsibilities, Elhady fails to articulate, much less offer proof of, personal engagement in sufficiently culpable conduct demonstrating deliberate indifference by any Defendant other than Bradley.

The claims against Beckham, Piraneo, Ferguson, and Lapsley must be dismissed.

### C.  Qualified Immunity

Bradley raises the defense of qualified immunity, which shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.  Adams v. Blount Cty., Tenn., 946 F.3d 940, 947 (6th Cir. Jan. 8, 2020).[15]  In determining whether officers are shielded from civil liability due to qualified immunity, the court must determine: (1) whether, when viewing the facts in the light most favorable to Elhady, Defendants violated Elhady's rights; and (2) whether those rights were clearly established at the time of the alleged violation.  Id. at 948.

So far, the discussion has focused on the first question.  Viewed in the light most favorable to Elhady, the facts support a finding that Bradley, but no other Defendant, violated Elhady's rights.  The Court now turns to the question of whether those rights were clearly established.

The parties disagree on how to define the right in question.  As Burley stated, "When there is no case directly on point, the court must find that definitional sweet spot, since 'it defeats the

---

[15] Because Defendants other than Bradley are dismissed, only Bradley's claim of qualified immunity requires further discussion.

qualified-immunity analysis to define the right too broadly . . . [and] it defeats the purpose of § 1983 to define the right too narrowly.'" 241 F. Supp. 3d at 836 (quoting <u>Kent v. Oakland Cty.</u>, 810 F.3d 384) (6th Cir. 2016)).[16] As the Sixth Circuit put it:

> Precedent demands instead that we go down the stairs of abstraction to a concrete, particularized description of the right. Though not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

<u>Hagans v. Franklin Cty. Sheriff's Office</u>, 695 F.3d 505, 508-509 (6th Cir. 2012).[17]

Bradley attempts to define the right at stake extremely narrowly. Bradley claims that "the question before the Court is whether it was clearly established that officers violate the law when they allow a detainee to remain in a climate-controlled cell, in a climate-controlled building, for approximately four hours, when the detainee uses the colloquial expression that he is freezing. . . . Elhady is unable to cite any Sixth Circuit or Supreme Court case, or any consensus of cases outside the Sixth Circuit, that would have put Ferguson or Bradley on notice in 2015 that their actions under those conditions would violate the [C]onstitution." Ferguson & Bradley Mot. at 34. Undoubtedly, Elhady has failed to identify binding precedent or a consensus of nonbinding

---

[16] Bradley would disagree that there is no case directly on point. He cites <u>Ray v. Schoo</u>, No. cv-10-942, 2014 WL 59733, at *3 (C.D. Cal Jan. 2, 2014), in which a court found that "it was not clearly established in 2009 (and is still not today) that subjecting a prisoner to temperatures as low as 40-45 degrees one time for more than five hours was cruel and unusual. However, he is incorrect that the deprivation alleged in <u>Ray</u> was more severe than the deprivation at issue here. <u>See</u> Bradley Mot. at 24. Elhady's theory of the case involves exposure to a colder temperature, as Elhady's expert wrote that "it would not be possible to cause a decrease in core temperature of 1°C if the cell temperature was in the range of 14.4-9.4°C (49-58°F). It seems unlikely this could occur if the cell temperature matched outside conditions (2.2°C) [35.96 degrees Fahrenheit]." Giesbrecht Report at 7.

[17] The same reasoning that applies to a § 1983 claim applies to a <u>Bivens</u> claim. <u>See</u> <u>Hagans</u>, 695 F.3d at 508-509 (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731 (2011) (a <u>Bivens</u> case)).

cases with such a holding.  But that definition is, in <u>Hagans</u>'s terms, too far down the stairs of abstraction.  It fails to respond to the essence of the right Elhady claims was violated and to the most serious violation the facts could support.  It is immaterial that a right was not clearly established that provided greater and more specific protections than the right claimed by Elhady.

Elhady argues that he had a clearly established right "to avoid being confined in any extreme temperatures, including temperatures that are at or near freezing, which are sufficiently cold to cause extreme discomfort."  Resp. at 39 (internal quotation marks omitted) (citing <u>Burley</u>, 241 F Supp. 3d at 837-838; <u>Middlebrook v. Tennessee</u>, 07-cv-2373, 2008 WL 2002521, at *10 (W.D. Tenn. May 6, 2008); <u>Hinojosa v. Livingston</u>, 807 F.3d 657, 670 (5th Cir. 2015); <u>Warren v. Litscher</u>, No. 2-cv-93, 2002 WL 32362656, at *1 (W.D Wis. Dec. 4, 2002)); <u>see also</u> <u>Burley</u>, 241 F. Supp. 3d at 837-838 (citing, <u>inter alia</u>, <u>Dixon v. Godinez</u>, 114 F.3d 640 (7th Cir. 1997); <u>Del Raine v. Williford</u>, 32 F.3d 1024 (7th Cir. 1994); <u>Burchett v. Kiefer</u>, 310 F.3d 937 (6th Cir. 2002); <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002)).

<u>Burley</u> found the "right to be free from exposure to severe weather and temperatures" to have been clearly established as of 2013.  <u>Burley</u>, 241 F. Supp. 3d at 839.  <u>Burley</u>'s definition of the right, while broadly worded, reasonably summarizes a scattered body of caselaw that eschews a bright line rule.  It presents a workable standard capturing what due process requires.

Therefore, the Court adopts <u>Burley</u>'s definition of the right in question and agrees that the right to be free from exposure to severe weather and temperatures was clearly established in 2015.[18]  Applying that rule and considering the facts in the light most favorable to the party

---

[18] Because Bradley focuses on a right far-removed from the right Elhady claims was violated, he does not squarely contest that the right Elhady claims was violated was clearly established by binding authority in 2015.  Concerning the timing, <u>Burley</u> found the right to be clearly established as of 2013; <u>a fortiori</u>, it was clearly established in 2015.  <u>See</u> <u>Burley</u>, 241 F. Supp. 3d at 836-838 (citing numerous pre-2013 cases).  Concerning the existence of binding precedent, <u>Burley</u> cites

opposing summary judgment, Elhady has raised a genuine question as to whether Bradley has violated the right.  Elhady's case against Bradley may proceed to trial.

## IV.    CONCLUSION

Elhady has produced enough evidence to support the conclusion that he was exposed to impermissibly cold conditions during his confinement on April 11, 2015.  However, he has only shown one Defendant to have been sufficiently involved such that a reasonable jury could find that he was deliberately indifferent to those conditions.  Defendant Bradley's motion for summary judgment is denied.  All other Defendants' motions for summary judgment are granted.

SO ORDERED.

Dated: February 10, 2020                    s/Mark A. Goldsmith_____
        Detroit, Michigan                         MARK A. GOLDSMITH
                                                  United States District Judge

---

numerous Sixth Circuit and Supreme Court cases.  See id. (citing, inter alia, Farmer v. Brennan, 511 U.S. 825, 833 (1994); Ivey v. Wilson, 832 F.2d 950, 954 (6th Cir. 1987); Spencer v. Bouchard, 449 F.3d 721, 728 (6th Cir. 2006); Wilson v. Seiter, 501 U.S. 294, 304 (1991);  Burchett v. Kiefer, 310 F.3d 937 (6th Cir. 2002); Hope v. Pelzer, 536 U.S. 730 (2002)).